STATE of Missouri, Respondent,

v.

Larna Lue EDWARDS, Appellant.

No. WD 55243.

Missouri Court of Appeals,
Western District.

May 29, 2001.

Motion for Rehearing and/or Transfer to
Supreme Court Denied July 3, 2001.

Application for Transfer Sustained
Aug. 21, 2001.

Case Retransferred Dec. 12, 2001.

Court of Appeals Opinion Readopted
Dec. 18, 2001.

Sean D. O'Brien, Kansas City, Ellen Flottman, Columbia, for appellant.

John Munson Morris, Asst. Atty. Gen., Shaun J. Mackelprang, Asst. Atty. Gen., Jefferson City, for respondent.

Before JOSEPH M. ELLIS, Presiding Judge, JAMES M. SMART, Jr., Judge and RONALD R. HOLLIGER, Judge.

ELLIS, Judge.

On July 24, 1996, Larna Edwards shot her husband, Bill Edwards, four times with a .38 caliber handgun. Mr. Edwards died from the wounds he received. As a result, the Caldwell County Prosecuting Attorney charged Mrs. Edwards by information with murder in the second degree, § 565.021.1(1).[1] On October 24, 1997, a jury acquitted her of murder in the second degree but found her guilty of the lesser-included offense of voluntary manslaughter, § 565.023.1(1). Mrs. Edwards' Motion for New Trial was subsequently denied, and on December 8, 1997, she was sentenced to five years in the Missouri Department of Corrections.

Mrs. Edwards appealed from that judgment, and on March 28, 2000, this Court reversed her conviction on a claim of instructional error. Thereafter, the State filed an application for transfer to the Missouri Supreme Court, which was granted on June 27, 2000.

Just days before the case was to be orally argued in the Supreme Court, the State discovered that Instruction # 7 that had been included in the legal file was not the instruction actually given to the jury at trial. According to the parties, two instructions submitted to the trial court had been labeled "Instruction # 7," and the clerk of the circuit court had provided the wrong Instruction # 7 for inclusion in the legal file. Instruction # 7 was the critical instruction addressed by the parties in their briefs and arguments in this Court, and it was the basis of this Court's holding in the original opinion. Indeed, Instruction # 7 was the focus of the parties' arguments in their substitute briefs filed in the Supreme Court. In any event, the parties filed a motion in the Supreme Court seeking leave to supplement the record to include the Instruction # 7 actually used at trial. On the date scheduled for oral argument, the Supreme Court granted the motion and re-transferred the case to this Court for reconsideration in light of the supplemental record. The parties were allowed to file new briefs and to re-argue the cause. Accordingly, we once again address Mrs. Edwards' appeal.

As noted previously, on July 24, 1996, Mrs. Edwards shot her husband, Bill Edwards, four times with a .38 caliber handgun. Mr. Edwards died from the wounds. Prior to trial, Mrs. Edwards' defense counsel filed written notice with the court, as required by § 563.033.2, advising that he intended to offer evidence of the battered

---

**1.** All statutory references are to RSMo 1994 unless otherwise noted.

spouse syndrome.[2] Subsequently, extensive evidence about battered spouse syndrome and its applicability to and impact on Mrs. Edwards was presented at trial. In addition, Mrs. Edwards testified in her own defense. The following is a summary of that evidence, as well as the facts surrounding the shooting.

Mrs. Edwards dropped out of school to elope with Mr. Edwards in 1953, when she as sixteen years old.[3] The marriage produced a daughter and two sons. Mr. Edwards began verbally and physically abusing Mrs. Edwards from the first day of their marriage, often hitting her with his fist, the back of his hand, or pieces of furniture. Mr. Edwards would also kick her and pull out some of her hair. When Mrs. Edwards was pregnant with their fourth child, Mr. Edwards struck her in the stomach, causing a miscarriage. He frequently threatened to kill Mrs. Edwards and their children, and he told her that he would track her down and kill her if she tried to run away.

Mr. Edwards also frequently struck the children with his fists or a belt, held them by the hair and/or kicked them. On one occasion, Mr. Edwards kicked their oldest son down a flight of stairs. In 1966, when their daughter Jackie was approximately thirteen years old, Mr. Edwards held a gun to her head, forced her to have sexual intercourse with him repeatedly and threatened to kill her if she did not comply or told anyone.[4]

Mrs. Edwards left Mr. Edwards two different times, but on both occasions she

---

2. Section 563.033, in its entirety, provides:

1. Evidence that the actor was suffering from the battered spouse syndrome shall be admissible upon the issue of whether the actor lawfully acted in self-defense or defense of another.
2. If the defendant proposes to offer evidence of the battered spouse syndrome, he shall file written notice thereof with the court in advance of trial. Thereafter, the court, upon motion of the state, shall appoint one or more private psychiatrists or psychologists, as defined in section 632.005, RSMo, or physicians with a minimum of one year training or experience in providing treatment or services to mentally retarded or mentally ill individuals, who are neither employees nor contractors of the department of mental health for the purposes of performing the examination in question, to examine the accused, or shall direct the director of the department of mental health, or his designee, to have the accused so examined by one or more psychiatrists or psychologists, as defined in section 632.005, RSMo, or physicians with a minimum of one year training or experience in providing treatment or services to mentally retarded or mentally ill individuals designated by the director, or his designee, for the purpose of examining the defendant. No private psychiatrist, psychologist, or physician shall be appointed by the court unless he has consented to act. The examinations ordered shall be made at such time and place and under such conditions as the court deems proper; except that if the order directs the director of the department of mental health to have the accused examined, the director, or his designee, shall determine the reasonable time, place and conditions under which the examination shall be conducted. The order may include provisions for the interview of witnesses.
3. No statement made by the accused in the course of any such examination and no information received by any physician or other person in the course thereof, whether such examination was made with or without the consent of the accused or upon his motion or upon that of others, shall be admitted in evidence against the accused on the issue of whether he committed the act charged against him in any criminal proceeding then or thereafter pending in any court, state or federal.

3. Mrs. Edwards was 61 years old at the time of this incident.

4. Jackie reported the abuse to her family physician, who referred her to a Clay County social worker. Jackie was temporarily placed in a foster home, but she was later returned to the Edwards' home.

returned home after Mr. Edwards promised that the beatings would not happen again.[5] However, after she returned, this "honeymoon" period would only last two or three days.

During the 1960's, Mr. and Mrs. Edwards ran a liquor store in Claycomo, Missouri. Mrs. Edwards also earned a realtor's license. Subsequently, the Edwards owned and operated a convenience store in Kingston, Missouri, called "The Country Store." Co-workers, customers, family members and acquaintances testified at trial that they often saw Mrs. Edwards with bruises on her face and arms and black eyes, and an employee of the store testified that he witnessed Mr. Edwards screaming and swearing at Mrs. Edwards at the store.

On one occasion in early 1996, Mrs. Edwards sought help from Caldwell County Sheriff Wayne Adkison. At trial, Sheriff Adkison testified that Mrs. Edwards came to his office to report her husband's violent behavior. At that time, he observed bruises on both of Mrs. Edwards' arms. However, Sheriff Adkison did not file a report or follow up on the complaint. Sheriff Adkison also testified that on another occasion Mrs. Edwards' daughter had contacted him about domestic violence in the home and her fear for her mother's safety, but he likewise did not file a report on that complaint.

On July 23, 1996, Mr. and Mrs. Edwards went to a car dealership in Kansas City, Kansas, and entered into an agreement to purchase a truck. As they were driving home, Mr. Edwards began to argue about the purchase. The argument continued after they got home. During that argument, Mr. Edwards pushed Mrs. Edwards and struck her with a hard object. Mrs. Edwards then went to bed, but remained awake all night for fear Mr. Edwards would kill her in her sleep. Mrs. Edwards testified at trial that it was her custom to either just sit quietly and not speak, trying not to incite him, or to just go to bed. She stated that she was afraid to go to sleep during such episodes because Mr. Edwards would frequently attack her while she was sleeping. Mrs. Edwards testified that she had experienced the same fear innumerable times during the course of her marriage.

The following morning at about 6:15 a.m., Mr. Edwards struck Mrs. Edwards, knocking off her glasses and causing her wristwatch to stop. Subsequently, Mrs. Edwards made breakfast for her husband, and they both went to work at the store. Once they arrived at work, Mr. Edwards continued the argument about the truck. During that argument, Mr. Edwards severely struck Mrs. Edwards' arm, apparently with a length of lead pipe, as she raised her arm to protect her face. At that point, Mrs. Edwards thought her arm might be broken. Mrs. Edwards testified at trial that this blow was the most painful she had ever experienced. She stated that from the look in Mr. Edwards' eyes and her past experience with him, she was certain that he was going to try to kill her.[6] Mrs. Edwards testified, "I knew one of us was not going to walk out of that store."

5. Mrs. Edwards also stated that she returned because Mr. Edwards controlled all of the family's finances and she had no money of her own on which to live. She told Dr. Marilyn Hutchinson, a psychologist, that Mr. Edwards had kept all of their money in cash, either in a safe or on his person. The couple did not have a checking account. Mrs. Edwards testified that she had stolen money from the store to buy her medication because Mr. Edwards would not give her money for it.

6. Mrs. Edwards testified that Mr. Edwards had a habit of staring at her continuously just before an attack.

After Mr. Edwards hit her, Mrs. Edwards picked up a .38 caliber handgun that was kept under the front counter in the store for security. When Mr. Edwards started to swear at her, Mrs. Edwards shot him four times from a distance of about five feet, striking him in the head, upper arm, and back. Mr. Edwards died from those wounds.

At trial, numerous experts testified about Mrs. Edwards' mental condition. Dr. Gerald Roderick, M.D., testified that he had treated Mrs. Edwards over a period of many years for stress anxiety. While treating Mrs. Edwards, Dr. Roderick noted that Mrs. Edwards was completely dominated by Mr. Edwards and frequently observed that Mrs. Edwards had bruises and black eyes. Dr. Roderick testified that Mrs. Edwards would refuse to seek treatment for her injuries and would tell him, "I can't go to the doctor for that. It would be on the record." Dr. Roderick stated that, when he would recommend that Mrs. Edwards leave her husband, she would respond, "If I ever leave him, he will kill me." Dr. Roderick also testified that he had treated the Edwards' daughter, Jackie. He stated that when she was 14–years–old, Jackie told him that Mr. Edwards had forced her to have sex with him.

The deposition of Dr. John Howell, a psychologist at Northwood Psychiatric Services, was read into evidence. Dr. Howell testified that he had diagnosed Mrs. Edwards with post-traumatic stress disorder, physical abuse of an adult victim, and dissociative disorder. He stated that, in his opinion, at the time of the shooting, Mrs. Edwards believed herself to be in imminent danger and that she could not conform her conduct to the requirements of the law when she shot her husband. Dr. Howell testified that "in her mind she saw a pattern of behavior on the part of her husband, which in sum, threatened serious injury or death."

Dr. Marilyn Hutchinson, a psychologist specializing in the treatment of trauma victims, testified that she had interviewed and tested Mrs. Edwards. Dr. Hutchinson stated that she had diagnosed Mrs. Edwards with post-traumatic stress disorder and dependent personality disorder. Dr. Hutchinson testified that Mrs. Edwards suffered from battered spouse syndrome. Dr. Hutchinson said that the cycle of violence and learned helplessness characterized by the Edwards' relationship is a well-established pattern of that syndrome. Dr. Hutchinson further testified that the effects of post-traumatic stress disorder alter an individual's perception of the threat of harm. She stated that the individual feels, due to a stimulus occurring in the present, emotions from past events that threatened him or her and that this feeling causes hypervigilance and quick responses. Dr. Hutchinson testified that repeated incidents of violence rise to the level of being unbearable over time and that, when the violence reaches a new plateau, the situation is unbearable and the individual cannot stand another incident.

Mrs. Edwards was tried in Caldwell County in October 1997. At the conclusion of the case, the jury acquitted her of murder in the second degree but found her guilty of the lesser-included offense of voluntary manslaughter, § 565.023.1(1). Mrs. Edwards' Motion for New Trial was subsequently denied, and on December 8, 1997, she was sentenced to five years in the Missouri Department of Corrections. The tortured path of her appeal has been recited earlier.

Mrs. Edwards brings five points of error on appeal. In her first point, she claims the trial court erred in refusing to submit her proposed jury instructions related to "battered spouse syndrome" and in sub-

mitting over her objection Instruction # 7, an unmodified version of the self-defense instruction contained in MAI–CR3d 306.06.

We first address Mrs. Edwards' contention that the trial court erred in refusing to submit her proffered instructions designated "A," "D," and "E". Based on the evidence presented at trial, particularly the expert testimony, Mrs. Edwards proffered those jury instructions contending they were authorized by § 563.033. Instruction No. A stated:

The defendant has presented the expert testimony of Dr. Marilyn Hutchinson. The purpose of this testimony is to assist you in understanding behavior and perceptions of the defendant and her state of mind at the time of the incident. You may consider the testimony about the affects [sic] of battering on women generally, as well as the affects [sic] of battering upon the defendant specifically.

You may also consider the expert testimony in evaluating both parts of the self-defense test, that is, whether the defendant believed that she was in imminent danger of death or serious physical injury, and whether that belief was reasonable.

You may consider how the defendant's experience as a battered woman may have affected her perceptions of danger, how imminent defendant perceived that danger to be, and what the defendant believed she had to do to protect herself.

You may also consider the expert testimony in deciding whether the defendant's belief was reasonable, that is, whether, in light of the defendant's experiences as a battered woman, as Dr. Marilyn Hutchinson testified, a person in the circumstances and from the viewpoint of the defendant would have reasonably believed that she was in imminent danger.

Not in MAI.

Instruction No. D read:

The defendant has presented evidence that she was psychologically and physically abused by the decedent. You should consider this evidence of the history of abuse and its cumulative affects [sic] in determining whether the defendant had a reasonable belief that she was in imminent danger of death or serious bodily injury at the time of the incident.

You should weigh her actions in light of how a reasonable person in her circumstances would have perceived and reacted to the abuse and threats.

In making this determination, the law requires you to consider the conditions as they appear [sic] to the defendant, taking into consideration all facts and circumstances known to her at the time of or prior to the incident.

In making this determination you should also consider the expert testimony of Dr. Marilyn Hutchinson, the purpose of this testimony is to assist you in understanding the behavior and perceptions of the defendant.

You may also consider the expert testimony on the issue [sic] defendant's state of mind, particularly in assessing her state of belief, that the use of deadly force was necessary to protect her from imminent death or serious bodily injury, and whether under all of the facts and circumstances that belief was reasonable.

Not in MAI.

Finally, Instruction No. E provided:

One of the issues in this case is whether the use of force by the defendant against Bill Edwards was in self-defense. In this state, the use of force, or the use of force (including the use of

deadly force) to protect oneself from harm is lawful in certain situations.

In order for a person lawfully to use force in self-defense, she must reasonable [sic] believe she is in imminent danger of harm from the other person. She need not be in actual danger, but she must have a reasonable belief that she is in such danger.

If she has such a belief, she is then permitted to use that amount of force which she reasonably believes to be necessary to protect herself.

But a person is not permitted to use deadly force, that is, force which she knows will create a substantial risk of causing death or serious physical injury, unless she reasonably believes she is in imminent danger of death or serious physical injury.

And, even then, a person may use deadly force only if she reasonably believes the use of such force is necessary to protect herself.

As used in this instruction, the term "reasonable belief" means a belief based on reasonable grounds, that is grounds that could lead a reasonable person in the same situation to the same belief. This depends upon how the facts reasonably appeared. It does not depend upon whether the belief turned out to be true or false.

On the issue of self-defense in this case, you are instructed as follows:

If the defendant reasonably believed she was in imminent danger of death or serious physical injury from the acts of Bill Edwards, and she reasonably believed the use of deadly force was necessary to defend herself, then she acted in lawful self-defense.

The state has a burden of proving beyond a reasonable doubt, that the defendant did not act in lawful self-defense. Unless you find beyond a reason-able doubt that the defendant did not act in lawful self-defense, you must find the defendant not guilty.

As used in this instruction, the term "serious physical injuries" means physical injury that creates a substantial risk of death or that causes serious disfigurement or protracted loss or impairment of [sic] disfunction of any part of the body.

Evidence has been introduced of the prior relationship between defendant and Bill Edwards, including evidence of psychological and physical abuse. You may consider this evidence of the history of abuse and it's cumulative affects in determining whether the defendant had a reasonable belief that she was in imminent danger of death or serious bodily injury at the time of the incident. You should weigh her actions in light of how a reasonable person in her circumstances would have perceived and reacted to the abuse and threats.

In making this determination, you should also consider the expert testimony of Dr. Marilyn Hutchinson, the purpose of this testimony is to assist you in understanding the behavior and perceptions of the defendant. You may also consider the expert testimony on the issue of the defendant' [sic] state of mind, particularly in assessing her state of belief, that the use of deadly force was necessary to protect her from imminent death or serious bodily injury, and whether under all of the facts and circumstances that belief was reasonable.

Evidence has been introduced of acts of violence not involving the defendant committed by Bill Edwards, and that the defendant was aware of these acts. You may consider this evidence in determining whether the defendant reasonably believed she was in imminent danger of harm from Bill Edwards. You may not

consider this evidence in determining who was the initial aggressor in the encounter or for any other reason.

If any threats against defendant were made by Bill Edwards, and were known by or had been communicated to the defendant, you may consider such in determining whether the defendant reasonably believed she was in imminent danger of harm from Bill Edwards.

You, however, should consider all of the evidence in the case in determining whether the defendant acted in lawful self-defense.

Mrs. Edwards argues that these instructions were necessary to instruct the jury on the application of the legal concepts and principles pertaining to battered spouse syndrome.

■ "The submission or refusal to submit a tendered instruction is within the trial court's discretion." *State v. Leisure,* 810 S.W.2d 560, 574 (Mo.App. E.D.1991). Accordingly, our review of a trial court's refusal to submit a proposed instruction is limited to whether the trial court abused its discretion in rejecting the instruction.

■ Each of Mrs. Edwards' proposed instructions specifically directed the jury to consider the testimony of Dr. Marilyn Hutchinson and the purpose or effect of her testimony. Rule 28.02(d) provides that non-MAI-CR instructions "shall be simple, brief, impartial, and free from argument." By specifically directing the jury's attention to Dr. Hutchinson's testimony, Mrs. Edwards' proffered instructions violated Rule 28.02(d) because they created an inference that her testimony was more significant than other evidence and, therefore, lacked impartiality. Furthermore, the proffered instructions violated the well-established principle that an instruction should not unduly direct attention to the credibility of a single witness or the manner in which the testimony should be received.

*Leisure,* 810 S.W.2d at 574–75; *State v. Everett,* 448 S.W.2d 873, 878 (Mo. 1970).

■ More importantly, MAI–CR3d 302.01 was submitted to the jury as required by Rule 27.02(e). It is well settled that MAI CR3d 302.01 is the only instruction to be given on the weight and value of the evidence and the believability of witnesses. *State v. Briscoe,* 913 S.W.2d 812, 816 (Mo.App. W.D.1995); *State v. Gilmore,* 797 S.W.2d 802, 809–10 (Mo.App. W.D. 1990); *Williams v. State,* 712 S.W.2d 404, 407 (Mo.App. W.D.1986) (relating to the predecessor of MAI CR3d 302.01, MAI CR2d 2.01). Indeed, the Notes on Use following MAI CR3d 302.01 specifically direct that, except as may be otherwise provided, no other or additional instruction may be given on the believability of witnesses or the effect, weight, or value of their testimony. All three proffered instructions, by directing the jury's attention to the testimony of Dr. Hutchinson and its purpose, improperly attempted to instruct the jury on the *effect* of her testimony and inferentially commented on the *weight* and *value* to be given to that testimony. Accordingly, the trial court did not abuse its discretion in refusing to submit Mrs. Edwards' Instructions "A," "D," and "E."

We next turn to the trial court's submission of Instruction # 7, an unmodified self-defense instruction patterned after MAI–CR 3d 306 .06, over Mrs. Edwards' objection. That instruction provided:

One of the issues in this case is whether the use of force by the defendant against Bill Edwards was in self-defense. In this state, the use of force, including the use of deadly force to protect oneself from harm is lawful in certain situations.

In order for a person lawfully to use force in self-defense, she must reasonably believe she is in imminent danger

of harm from the other person. She need not be in actual danger but she must have a reasonable belief she is in such danger.

If she has such a belief, she is then permitted to use that amount of force which she reasonably believes to be necessary to protect herself.

But a person is not permitted to use deadly force, that is, force which she knows will create a substantial risk of causing death or serious physical injury, unless she reasonably believes she is in imminent danger of death or serious physical injury.

And, even then, a person may use deadly force only if she reasonably believes the use of such force is necessary to protect herself.

*As used in this instruction, the term "reasonable belief" means a belief based on reasonable grounds, that is, grounds which could lead a reasonable person in the same situation to the same belief.* This depends upon how the facts reasonably appeared. It does not depend upon whether the belief turned out to be true or false.

On the issue of self-defense in this case, you are instructed as follows:

If the defendant *reasonably believed* she was in imminent danger of death or serious physical injury from the acts of Bill Edwards and she *reasonably believed* that the use of deadly force was necessary to defend herself, then she acted in lawful self-defense.

The state has the burden of proving beyond a reasonable doubt that the defendant did not act in lawful self-defense. Unless you find beyond a reasonable doubt that the defendant did not act in lawful self-defense, you must find the defendant not guilty.

As used in this instruction, the term "serious physical injury" means physical injury that creates a substantial risk of death or that causes serious disfigurement or protracted loss or impairment of the function of any part of the body.

Evidence has been introduced of the reputation of the defendant for being peaceful and law-abiding. You may consider this evidence in determining who was the initial aggressor in the encounter and for no other purpose.

Evidence has been introduced that Bill Edwards had a reputation for being violent and turbulent, and that the defendant was aware of that reputation. You may consider this evidence in determining whether the defendant reasonably believed she was in imminent danger of harm from Bill Edwards.

Evidence has been introduced of the prior relationship between defendant and Bill Edwards including evidence of arguments and acts of violence. You may consider this evidence in determining who was the initial aggressor in the encounter and you may also consider it in determining whether the defendant reasonably believed she was in imminent danger of harm from Bill Edwards.

Evidence has been introduced of acts of violence not involving the defendant committed by Bill Edwards and that the defendant was aware of these acts. You may consider this evidence in determining whether the defendant reasonably believed she was in imminent danger of harm from Bill Edwards. You may not consider this evidence in determining who was the initial aggressor in the encounter or for any other reason.

Evidence has been introduced of threats made by Bill Edwards against defendant. You may consider this evidence in determining who was the initial aggressor in the encounter.

If any threats against defendant were made by Bill Edwards and were known by or had been communicated to the defendant, you may consider this evidence in determining whether the defendant reasonably believed she was in imminent danger of harm from Bill Edwards.

You, however, should consider all of the evidence in the case in determining whether the defendant acted in lawful self-defense.

(emphasis added).

 As noted, Instruction # 7 was an unmodified version of MAI–CR 3d 306.06, the MAI–CR instruction for self-defense. Ordinarily, where an MAI instruction addresses a given issue, "it must be given to the exclusion of any other instruction." *State v. El Dorado Mgmt. Corp., Inc.*, 801 S.W.2d 401, 406 (Mo.App. E.D.1990). However, "MAI–CR and its Notes on Use are 'not binding' to the extent they conflict with the substantive law." *State v. Carson*, 941 S.W.2d 518, 520 (Mo. banc 1997). Where the law has been materially altered by statute following the promulgation of the MAI–CR instruction, the trial court may no longer rely upon the MAI instruction as an accurate statement of the law, and the trial court must modify the MAI instruction to comply with the change in the law. *El Dorado Mgmt.*, 801 S.W.2d at 406.

 In the State of Missouri, self-defense is a person's right to defend himself or herself against attack. *State v. Chambers*, 671 S.W.2d 781, 783 (Mo. banc 1984). The right is codified in § 563 .031. Four elements generally must be present to permit the use of deadly force in self-defense: (1) an absence of provocation or aggression on the part of the defender; (2) a reasonable belief that deadly force is necessary to protect himself or herself against an immediate danger of death, ser-

ious physical injury, rape, sodomy, or kidnapping or serious physical injury through robbery, burglary or arson; (3) a reasonable cause for that belief; and (4) an attempt by the defender to do all within his or her power consistent with his or her own personal safety to avoid the danger and the need to take a life. § 563.031; *Chambers*, 671 S.W.2d at 783. The third element, the reasonable cause for the belief that deadly force is necessary, is viewed from the circumstances as they appeared to the defendant. *State v. Grier*, 609 S.W.2d 201, 206 n. 2 (Mo.App. W.D. 1980). However, the reasonableness of the belief itself, the second element, is determined by an objective test. *Id.* This objective standard measures conduct based on what a hypothetical ordinary reasonable and prudent person would have believed and how they would have reacted. *See State v. Epperson*, 571 S.W.2d 260, 265 (Mo. banc 1978); *Hartland Computer Leasing Corp., Inc. v. Insurance Man, Inc.*, 770 S.W.2d 525, 527–28 (Mo.App. E.D.1989). Thus, the standard is whether the facts available to the defendant at the moment deadly force is used would have caused a hypothetical reasonable and prudent person to reasonably believe that deadly force was necessary to save himself or herself from an immediate danger of serious bodily injury or death.

Accordingly, MAI CR 3d 306.06 accurately reflects the general law of self-defense in this state. However, subsequent to the drafting of MAI–CR 3d 306.06, the Missouri Legislature enacted § 563.033 which allows evidence of battered spouse syndrome to be submitted into evidence on the issue of self-defense. Mrs. Edwards contends that, where applicable, § 563.033 requires that MAI–CR 3d 306.06 be modified.

Over the last twenty or so years, battered spouse syndrome has gained sub-

stantial scientific acceptance and has been recognized in numerous jurisdictions. *See State v. Williams,* 787 S.W.2d 308 (Mo. App. E.D.1990); *State v. Koss,* 49 Ohio St.3d 213, 551 N.E.2d 970 (1990); *Commonwealth v. Rose,* 725 S.W.2d 588 (Ky. 1987); *State v. Moore,* 72 Or.App. 454, 695 P.2d 985 (1985); *Ibn–Tamas v. U.S.,* 407 A.2d 626 (D.C.App.1979). The syndrome is a type of post-traumatic stress disorder that manifests itself in a collection of symptoms including a highly fearful state, isolation, withdrawal, and a heightened sensitivity to situations that precede violence or an increase in violence. *State v. Hodges,* 239 Kan. 63, 716 P.2d 563, 566 (1986). The victim rarely discusses the situation with anyone due to a feeling that there is nothing that can be done. *Id.* The battered spouse attempts to minimize the violence and to live for any positive aspects of the relationship. *Id.* Victims exhibit a "learned helplessness" in which repeated trauma causes the victims to learn that they have no control and cannot escape, and therefore, they stop trying to escape from the situation, even when an opportunity to do so is present. *Id.; Williams,* 787 S.W.2d at 312.

> Several factors were common to all cases. First each woman stated that she was convinced the batterer was going to kill her. Violent assaults had taken place previously in all of these cases. In the final incident, however, something different was noted by these women which convinced them that the batterer really was going to kill them this time.

*Williams,* 787 S.W.2d at 312 (*quoting* Lenore Walker, The Battered Woman 220 (1979)).

 While evidence of the battered spouse syndrome is not in and of itself a defense to a murder charge, its function is to aid the jury in determining whether a defendant's fear and claim of self-defense are reasonable. *State v. Borrelli,* 227 Conn. 153, 629 A.2d 1105, 1114 (1993); *Dyer v. Commonwealth,* 816 S.W.2d 647, 654 (Ky.1991) (*overruled on other grounds by Baker v. Commonwealth,* 973 S.W.2d 54 (Ky.1998)); *Hodges,* 716 P.2d at 570; *State. v. Leidholm,* 334 N.W.2d 811, 819–20 (N.D.1983); *People v. Gomez,* 72 Cal. App.4th 405, 85 Cal.Rptr.2d 101, 108 (1999). The battering relationship is otherwise beyond the understanding of the average juror. *Hodges,* 716 P.2d at 567. It is difficult for a lay person to understand why a battered spouse does not escape the situation or notify the police. *Id.* A lay person may perceive that a battered woman is free to leave the spouse at any time. *Id.* Indeed, a juror may otherwise conclude by "common sense" that if the abuse were so bad the woman would have left the relationship. *Id.*

> [T]here is no easy answer to why battered women stay with their abusive husbands. Quite likely emotional and financial dependency and fear are the primary reasons for remaining in the household. They feel incapable of reaching out for help and justifiably fear reprisals from their angry husbands if they leave or call the police. The abuse is so severe, for so long a time, and the threat of great bodily harm so constant, it creates a standard mental attitude in its victims. Battered women are terror-stricken people whose *mental state is distorted* and bears a marked resemblance to that of a hostage or a prisoner of war. The horrible beatings they are subjected to brainwash them into believing there is nothing they can do. They live in constant fear of another eruption of violence.

*Id.* Thus, the Missouri General Assembly has determined that evidence of "battered spouse syndrome" is admissible in Mis-

souri on the issue of self-defense because it explains what might otherwise be inexplicable—why the defendant chose to use deadly force in a situation where a reasonable person would simply leave the relationship. *State v. Pisciotta*, 968 S.W.2d 185, 189 (Mo.App. W.D.1998).

Mrs. Edwards argues the pattern instruction submitted by the trial court failed to provide the jury with a mechanism for applying the battered spouse syndrome provisions of § 563.033. She contends that Instruction # 7 improperly applied the "reasonable person" standard without reference to battered woman syndrome. She further asserts that the instruction improperly instructed the jury that it could only consider the evidence of threats and violence by Mr. Edwards against Mrs. Edwards in determining whether she was the initial aggressor and whether she reasonably believed she was in danger of imminent harm from Mr. Edwards. She claims the instruction thereby precluded the jury from considering those acts and battered spouse syndrome in determining whether Mrs. Edwards reasonably believed that deadly force was necessary to defend herself and whether she could have retreated rather than using deadly force.

In *State v. Williams*, 787 S.W.2d 308 (Mo.App. E.D.1990), the defendant was charged with first-degree murder. *Id.* at 309. The information alleged that she " 'knowingly attempted to cause the death of Louis Teague and in the course thereof actually caused the death of Joel Robinson by striking Joel Robinson with an automobile.' " *Id.* She filed her notice of intent to offer evidence that she suffered from battered spouse syndrome pursuant to § 563.033. *Id.* at 310. The state objected to that evidence based upon the fact that the defendant was not married to Teague and, therefore, was not a spouse under the

applicable statutory language and because the admitted conduct of the defendant did not constitute self-defense. *Id.* The trial court refused to allow the evidence of battered spouse syndrome, but the matter was preserved through an offer of proof. *Id.* Williams was subsequently convicted of second-degree murder. *Id.* at 309.

On appeal, the court held that evidence of the syndrome applied equally whether the woman was married to the batterer or merely in a relationship with him. *Id.* at 312. In addition, the court addressed the effect of the evidence. It noted that battered spouse syndrome is "a specific medical or emotional condition bearing certain identifiable characteristics and arising from a specific source." *Id.* at 311. The court recognized that in the absence of the syndrome, the defendant in that case established only the first of the four elements of self-defense, the absence of aggression or provocation on her part. *Id.* at 312. The court then stated:

> [I]f the evidence of the syndrome is to have any meaning under Sec. 563.033 it must be as a modification of the mental state required of the battered woman. More accurately stated it is that the syndrome creates a perception in the battered woman *so that as to her the required elements have been met.*

*Id.* (emphasis added). As a result of this analysis, the court went on to hold that "the evidence is to be weighed by the jury in light of how the reasonable *battered woman* would have perceived and reacted in view of the prolonged history of physical abuse." *Id.* at 312–13 (emphasis in original).

While we agree with the *Williams* court's analysis, it is not completely accurate to say that the conduct should be evaluated as a *reasonable battered woman* would have perceived it. This language seems to be something of an oxymoron.

As noted, *supra*, battered spouse syndrome is a medically recognized condition with certain identifiable characteristics and arising from a specific source. *Williams*, 787 S.W.2d at 311. A battered woman is a terror-stricken person whose mental state is distorted. *State v. Hundley*, 236 Kan. 461, 693 P.2d 475, 479 (1985). Thus, a more accurate statement of the law is that, if the jury believes the defendant was suffering from battered spouse syndrome, it must weigh the evidence in light of how an otherwise reasonable person who is suffering from battered spouse syndrome would have perceived and reacted in view of the prolonged history of physical abuse.

■ In the case at bar, the only basis for the submission of a self-defense instruction was the evidence of battered spouse syndrome. As a result, applying the foregoing principles, it is readily apparent that Instruction # 7 failed to properly instruct the jury. That instruction restricted the jury's consideration of the evidence of acts of violence committed by Mr. Edwards to determining who was the initial aggressor in the encounter and whether Mrs. Edwards *"reasonably believed* she was in imminent danger of harm from Bill Edwards." (emphasis added). The instruction did not allow the jury to consider previous acts of violence or threats in assessing whether Mrs. Edwards could have retreated from the situation or whether she had reasonable cause to believe she was in danger of death or serious physical injury. Furthermore, *"reasonable belief"* for purposes of the instruction was defined as "a belief based on reasonable grounds, that is, grounds which could lead a *reasonable person in the same situation to the same belief."* Thus, the jury was told by the evidence

that Mrs. Edwards was terror-stricken and had a distorted mental state based on long years of physical and emotional abuse which would cause her to perceive and react differently to events than would the average person. But the instruction told the jurors, in effect, to disregard that evidence. It directed the jurors to determine whether Mrs. Edwards had a reasonable belief that she was in imminent danger based on what a reasonable and prudent person would think. Obviously, a reasonable and prudent person does not perceive and react in the same way that an otherwise reasonable and prudent person who is suffering from battered spouse syndrome based on a prolonged history of physical abuse would perceive and react. Thus, the instruction precluded the jury from making a determination as to whether Mrs. Edwards was suffering from battered spouse syndrome and, if so, whether she had a reasonable belief that she was in imminent danger based on what an otherwise reasonable and prudent person who is suffering from battered spouse syndrome would think.

■ As the court stated in *Williams*, "if the evidence of the syndrome is to have any meaning under Sec. 563.033 it must be as a modification of the mental state required of the battered woman." *Williams*, 787 S.W.2d at 312. Instruction # 7 did not modify the required mental state to reflect the law related to battered spouse syndrome and, therefore, did not follow the existing substantive law as expressed in § 563.033 and construed in *Williams*.[7] The instruction was contradictory, confusing and misleading. Accordingly, the submission of the instruction was prejudicial and requires reversal. See, *AgriBank*

---

7. Where the self-defense instruction contained in MAI CR3d 306.06 conflicts with existing statutory and/or case law, that in- struction must be modified to appropriately reflect the law. *State v. Zumwalt*, 973 S.W.2d 504, 509 (Mo.App. S.D.1998).

*FCB v. Cross Timbers Ranch, Inc.,* 919 S.W.2d 256, 260 (Mo.App. S.D.1996).

### Discussion of Other Points

Since our resolution of Point I is dispositive of the appeal, we need not address in detail the other points presented by Mrs. Edwards on appeal. However, because the case must be remanded for a new trial, we will comment on the remaining issues briefly for the sake of judicial economy.

In her second point, Mrs. Edwards contends that the trial court erred in refusing to submit a jury instruction on the lesser-included offense of involuntary manslaughter. She argues that there was evidence from which the jury could conclude that she did not knowingly or purposely cause her husband's death. In response, the State contends that the evidence did not support an involuntary manslaughter instruction because no evidence was presented at trial from which the jury could find that Mrs. Edwards acted recklessly.

We decline to address this issue. We cannot predict what evidence might be presented on retrial. Accordingly, it would serve no worthwhile purpose to adjudicate the point.

In her third point, Mrs. Edwards argues that the trial court plainly erred when it failed, *sua sponte,* to instruct the jury to disregard certain of the prosecutor's comments in his opening statement and closing argument to the jury. During opening statement, the prosecutor stated:

> If you think it doesn't matter to me, what you do in your community, you're wrong... We're not in California where murder is seemingly not against the law anymore. We're not a society that permits 5,000 other witnesses to come into our community and tell us what life is worth. This is your job. It's your community.

\* \* \*

> I respectfully suggest that you send a message about what life is worth. Do we send a message to our young people, perhaps many troubled young people who are married, that the courthouse isn't there for their protection, that Judge Griffin and the sheriff aren't there to help them? Do we send that message?

> Do we send a message that the laws the Missouri legislature has enacted that will actually remove an abusive spouse from the home and make it a crime to go back until a hearing is held? Do we say that's all for naught? Do the taxes we pay to pay the sheriff and build this court house go for nothing?

During closing argument, the prosecutor stated:

> The defendant in this case has spent one night in jail. One night in jail, and she has moved freely throughout this community. She has gone throughout the community in her pickup truck that she bought within a week after this death. And if you don't think that has some perception problems for law enforcement in this community, you're wrong. What job are you going to give your young prosecutor if you find the defendant not guilty in this case? What message are you going to send to the young people of this community? That it's okay to shoot a man four times in the back and then come to court with your experts and say, "Oh, it was post-traumatic stress syndrome?" And, bluntly, I'm offended by that.

\* \* \*

> What will you say by your verdict? What will we say we've done five years from now, ten years from now, that we all learned to be helpless?

Mrs. Edwards also calls our attention to numerous other comments and arguments made by the prosecutor that she contends were improper for various reasons, including erroneous statements about the law, personal opinions and argument outside the record.

A prosecutor may neither argue to the jury that he has personal opinions about a case, *State v. Baller,* 949 S.W.2d 269, 272 (Mo.App. E.D.1997), nor personalize the jury by relating accusations against the defendant to the jurors' own safety. *State v. Storey,* 901 S.W.2d 886, 902 (Mo. banc 1995); *State v. Heinrich,* 492 S.W.2d 109, 114 (Mo.App. W.D. 1973). Furthermore, a prosecutor may not challenge a jury on how it will account to the community for its verdict if it finds a defendant not guilty. *See State v. Thomas,* 780 S.W.2d 128, 134 (Mo.App. E.D.1989).

We think some of the prosecutor's arguments crossed the line. However, since the case must be remanded for a new trial on other grounds, we need not detail each and every item of concern. On retrial, we are confident the prosecutor will refrain from personalizing the argument, avoid erroneous statements of law, and eschew challenging the jury regarding how it will account to the community for its verdict if it finds the defendant not guilty. Moreover, if the prosecutor does engage in improper argument, defense counsel will have an opportunity to object, the trial court will have an opportunity to rule on the propriety of the argument, and the issue may be properly preserved for appeal.

In her fourth point, Mrs. Edwards argues that the trial court erroneously overruled her motion to suppress her statement to law enforcement officers on the date of the incident. Mrs. Edwards was arrested at the scene of the shooting and transported to the Caldwell County sheriff's office. Deputy Roger Porter described Mrs. Edwards as very upset, emotional, and crying when he interviewed her. He stated that he waited approximately twenty minutes for her to compose herself before interrogating her. At that time he asked:

Q: Are you willing to talk to me?

A: Yes, sir. I will have a lawyer. I will have a lawyer. I will have a lawyer, in any case, before talking to you.

Q: You want a lawyer?

A: I will have one. I can afford one. Yes, sir, I will have a lawyer.

Q: Ok, but do you want to talk to me now and let me know what happened?

A: I will have Gene McFaddin from Gallatin.

Q: Okay.

A: He's been a long time family friend.

Q: —Are you willing to talk to me now?

A: I can't tell you any different that I would tell him. And I'm not lying about anything.

Q: Okay, do you want to talk to me?

A: What?

Q: Do you want to tell me what happened?

A: Yes, I'll tell you what happened.

Following this exchange, Mrs. Edwards signed a *Miranda* waiver and gave a statement to Deputy Porter.

Defense counsel objected to the admission of her statement at trial, the objection was overruled, and the statement was admitted into evidence. On appeal, Mrs. Edwards contends that the statement should have been suppressed and that its admission into evidence violated her rights under the Sixth and Fourteenth Amendments to the U.S. Constitution and Article I, Sec. 18(A) of the Missouri Constitution.

In response, the State maintains that the interrogation was proper. The State contends that Mrs. Edwards' statements to Deputy Porter did not constitute a request for counsel. The State further argues that Mrs. Edwards affirmatively waived her right to have counsel present by signing a waiver and through her comments to Deputy Porter.

The record on appeal does not contain transcripts of any pre-trial hearings or a motion to suppress the statements. However, the trial court's docket sheet indicates that a "motion to suppress" was "taken under advisement" the day before trial. In addition, there is no ruling on the motion to suppress in the record, although the court did admit the statement over Mrs. Edwards' objection. With an incomplete record, we are reluctant to decide the issue. On remand, Mrs. Edwards will again have an opportunity to file a motion to suppress the statement, and in the event that motion is denied, she will have an opportunity to make an adequate record for appeal.

In her fifth and final point, Mrs. Edwards contends the trial court plainly erred when it failed to *sua sponte* prohibit testimony regarding her ownership and sale of weapons unrelated to the charged offense. She argues that this evidence was irrelevant, immaterial, and was introduced solely to inflame the jury. We decline to address the issue. There was no objection to the testimony at trial. If the testimony is offered on retrial, defense counsel will have the opportunity to object to that testimony, and the trial court will have a chance to decide the question.

### Conclusion

The judgment of conviction is reversed because Instruction # 7 erroneously instructed the jury on self-defense and the impact of battered spouse syndrome and the defendant was prejudiced thereby. The case is remanded for further proceedings consistent with this opinion.

All concur.