

# Missouri Court of Appeals

## Southern District

### Division One

BRIAN SHAWN JONES,                     )
                                       )
              Movant-Appellant,        )
                                       )
v.                                     )        No. SD36915
                                       )        Filed:  September 1, 2021
STATE OF MISSOURI,                     )
                                       )
              Respondent-Respondent.   )

APPEAL FROM THE CIRCUIT COURT OF GREENE COUNTY

Honorable Calvin Holden, Circuit Judge

**<u>AFFIRMED</u>**

Brian Jones (Jones) appeals from an order denying his amended Rule 29.15 motion to set aside his convictions for second-degree murder and armed criminal action (ACA). *See* §§ 565.021, 571.015.[1]  Because the motion court's decision to deny relief after an evidentiary hearing was not clearly erroneous, we affirm.

---

[1] All rule references are to Missouri Court Rules (2018).  All statutory references are to RSMo Cum. Supp. (2013).

Jones bore the burden of proving the grounds asserted in his post-conviction motion by a preponderance of the evidence. *See* Rule 29.15(i); *McLaughlin v. State*, 378 S.W.3d 328, 337 (Mo. banc 2012). Our review of the denial of a Rule 29.15 motion is limited to determining whether the motion court's findings of fact and conclusions of law are clearly erroneous. Rule 29.15(k); *Williams v. State*, 168 S.W.3d 433, 439 (Mo. banc 2005). We will find clear error only if a full review of the record leaves us with a definite and firm impression that a mistake has been made. *Zink v. State*, 278 S.W.3d 170, 175 (Mo. banc 2009). We presume the motion court's findings and conclusions are correct. *McLaughlin*, 378 S.W.3d at 336-37. Further, "this Court defers to the motion court's determination of credibility." *Smith v. State*, 413 S.W.3d 709, 715 (Mo. App. 2013). The following summary of facts has been prepared in accordance with these principles.

Jones was charged, as a prior and persistent offender, with second-degree murder and ACA for shooting and killing C.J.C. (Victim) in October 2014. A jury trial on these two counts was held.[2] The defense theory at trial was that Jones shot Victim in self-defense after Victim pulled a BB gun. Those testifying for the State, however, included two eyewitnesses who were seated inside the vehicle where the shooting took place. Both witnesses testified that Victim never pulled a weapon and was shot by Jones in a robbery involving drugs. The jury found Jones guilty of second-degree murder and ACA. The trial court sentenced Jones as a prior and persistent offender to respective prison terms of life and ten years, with the sentences to run concurrently. This Court affirmed Jones'

---

[2] Jones was also charged with four other counts: (1) second-degree assault; (2) ACA associated with that assault; (3) first-degree tampering; and (4) stealing a firearm. Prior to trial, Jones pled guilty to second-degree assault and ACA. He also waived his right to a jury trial on the last two counts, which were later dismissed.

convictions and sentences on direct appeal. *State v. Jones*, 553 S.W.3d 909 (Mo. App. 2018).

Jones filed a *pro se* Rule 29.15 motion. Thereafter, appointed counsel filed an amended motion.[3] The amended motion alleged that Jones' trial counsel provided ineffective assistance of counsel in three respects. The first two claims alleged ineffective assistance for failing "to investigate and call a neuropsychologist to testify": (1) at trial, "in support of [Jones'] self-defense claim that [he] suffered from brain damage at the time of the offense"; and (2) at sentencing, "in mitigation" that Jones was "brain damaged." The third claim alleged ineffective assistance for failing "to object, move for a mistrial, and adequately preserve issues for appeal … after the court removed a juror from the jury during the State's case in chief and then informed the rest of the jury why the juror was removed." The trial court revealed that the juror had sent a note "indicating that she knew the mother of the witness" who had just testified.

The motion court judge, who also had been the trial judge, held an evidentiary hearing on the motion. Two witnesses testified. A neuropsychologist, Dr. Robert Heilbronner (Dr. Heilbronner), testified that Jones' testing results and medical records supported a diagnosis of neuropsychological impairment or brain damage. Jones' trial counsel, Russell Dempsey (Dempsey), also testified. Thereafter, the motion court issued findings of fact and conclusions of law denying Jones' amended motion for post-conviction relief. This appeal followed. Presenting three points, Jones contends the motion court clearly erred in denying each of his three claims.

---

[3] This Court has independently verified the timeliness of Jones' post-conviction motions. *See Moore v. State*, 458 S.W.3d 822, 825-26 (Mo. banc 2015).

In each point, Jones contends he received ineffective assistance of trial counsel. To prevail on a claim of ineffective assistance of trial counsel, the movant must satisfy a two-prong test. *Zink*, 278 S.W.3d at 175. First, the movant must "show that counsel's representation fell below an objective standard of reasonableness." *Strickland v. Washington*, 466 U.S. 668, 688 (1984). "A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Id*. at 689. Second, the movant must show that trial counsel's failure prejudiced him. *Id*. at 687. To satisfy the prejudice prong under the *Strickland* test, movant is required to show there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Anderson v. State*, 196 S.W.3d 28, 33 (Mo. banc 2006). Both of these prongs must be proven to obtain relief based upon ineffective assistance of counsel. *Zink*, 278 S.W.3d at 175. Movant must overcome a strong presumption that counsel's conduct was reasonable and effective. *Id*. at 176. Additional facts will be included below as we address Jones' three points on appeal.

*Point 1*

Point 1 contends the motion court clearly erred in denying Jones' claim that his trial counsel was ineffective for failing to call Dr. Heilbronner as a witness during the guilt phase of the trial. To prevail on a claim of ineffective assistance of counsel for failure to call a witness, the following must be proven: (1) trial counsel knew or should have known of the existence of the witness; (2) the witness could be located through reasonable

4

investigation; (3) the witness would testify; and (4) the witness' testimony would have produced a viable defense. ***Worthington v. State***, 166 S.W.3d 566, 577 (Mo. banc 2005). "Counsel's decision to not call a witness is presumptively a matter of trial strategy and will not support a claim of ineffective assistance of counsel unless the defendant clearly establishes otherwise." ***Williams***, 168 S.W.3d at 441. The following facts are relevant to this point.

At trial, Jones testified that he shot Victim in self-defense after Victim pulled what looked like a real gun. In support of this self-defense theory, Dempsey adduced the following additional evidence: (1) Jones' testimony that, after the shooting, he found in his car a "CO2 cartridge BB gun" and a black backpack; (2) testimony from Victim's friend that Victim possessed a black backpack and a BB gun, and that Victim's friend had seen Victim with the BB gun tucked in his waistband earlier on the day of the shooting; and (3) the items an officer found in Jones' car included a black backpack containing two or three dozen BBs, more BBs under the back seat, and two CO2 air cartridges, which are typically used to power a BB gun. The gun, however, was never found.

At the motion hearing, Dempsey testified that he discussed possible trial strategies with Jones and determined the best strategy was to argue self-defense. This strategy required evidence that Jones had "a reasonable belief" that such force was necessary to defend himself from what he believed was "the imminent use of unlawful force." Dempsey and Jones also discussed retaining a neuropsychologist, but Dempsey was concerned that introducing evidence of brain damage would "come into conflict with our argument of self-defense." According to Dempsey, he consistently argued "straight self-defense" and only

5

once mentioned "imperfect self-defense" in reference to a lesser-included charge of involuntary manslaughter.[4]

The motion court found that Dempsey's reasons for not calling a neuropsychologist as a witness were "compelling" because such testimony "would have been in direct conflict with showing [Jones] made a reasoned decision to use deadly force." The motion court concluded that Dempsey's decision to not call a neuropsychologist was "sound trial strategy" and that Jones also failed to demonstrate prejudice.

Jones' first point contends Dempsey was "ineffective for failing to call [Dr. Heilbronner] as a witness during the guilt phase of the trial" because his testimony "would have supported [Jones'] argument at trial that he committed 'imperfect self-defense.' Furthermore, [Jones] was prejudiced by this failure." We disagree.

Jones failed to overcome the presumption that Dempsey's decision to not call Dr. Heilbronner or any neuropsychologist was reasonable trial strategy. *See Williams*, 168 S.W.3d at 441 (counsel's "decision to not call a witness is presumptively a matter of trial strategy"); *see also Zink*, 278 S.W.3d at 176 (movant "must overcome a strong presumption that counsel's conduct was reasonable and effective"). Although Jones argues

---

[4] Dempsey argued at closing that with respect to the lesser-included charge, "imperfect self-defense" meant that Jones may have acted "recklessly" in defending himself:

> There's another charge we'll call a lesser included charge. It's a manslaughter charge. This one is also known as imperfect self-defense. So let's say you look at it and you decide, "You know what? That wasn't correct self-defense. Instead, I believe he acted recklessly with regard to his knowledge of what he was defending." Maybe you look at it and decide that it was purely a reckless act that caused this, and he was reckless in how he perceived what was going on.

that a neuropsychologist's testimony would have supported an argument that Jones acted in "imperfect self-defense," Dempsey testified at the evidentiary hearing that the chosen trial strategy was to argue "straight self-defense," not imperfect self-defense. In support of the straight self-defense theory, Dempsey presented evidence from various sources that the BB gun existed and that Victim had it with him on the night of the shooting. "It is not ineffective assistance of counsel to pursue one reasonable trial strategy to the exclusion of another reasonable trial strategy." *Anderson*, 196 S.W.3d at 33; *Barton v. State*, 432 S.W.3d 741, 749 (Mo. banc 2014).

Moreover, a neuropsychologist's testimony would have undermined the straight self-defense strategy. Self-defense requires a reasonable belief that the force used was necessary. *See* § 563.031.1; *Hendrix v. State*, 369 S.W.3d 93, 98 (Mo. App. 2012). The reasonableness of that belief is determined from an objective test that "measures conduct based on what a hypothetical ordinary reasonable and prudent person would have believed and how they would have reacted." *State v. Edwards*, 60 S.W.3d 602, 612 (Mo. App. 2001); *Hendrix*, 369 S.W.3d at 98. Dempsey decided that presenting evidence about Jones' reactions being the result of neurological impairment or brain damage would directly conflict with the different strategy of presenting evidence that Jones reasonably believed the use of deadly force was necessary to defend himself. Therefore, testimony from a neuropsychologist concerning brain damage would not have supported the reasonable trial strategy of relying on straight self-defense during the guilt phase of the trial. *See Worthington*, 166 S.W.3d at 577 (requiring the witness' testimony to produce a viable defense). "If a potential witness's testimony would not unqualifiedly support a defendant, the failure to call such a witness does not constitute ineffective assistance." *Id*.;

7

*see also* **Paulson v. State**, 342 S.W.3d 452, 456 (Mo. App. 2011). "As a matter of trial strategy, the determination to not call a witness is virtually unchallengeable." **Worthington**, 166 S.W.3d at 577. For all these reasons, the motion court did not clearly err by finding that Dempsey's decision to not call a neuropsychologist during the guilt phase of the trial was sound trial strategy. Point 1 is denied.

*Point 2*

Point 2 contends the motion court clearly erred in denying Jones' claims that his trial counsel was ineffective for failing to call Dr. Heilbronner as a witness during the sentencing phase of the trial. The following facts are relevant to this point.

At the sentencing hearing for Jones' second-degree murder and ACA convictions, the trial court also sentenced Jones for two additional counts that he pled guilty to just prior to the start of his jury trial in this matter. Both counts – second-degree assault and ACA – arose the night before the murder and involved Jones beating another man, M.P., with a croquet mallet after the man was "duct-taped" to a wheelchair. At sentencing, the prosecutor finished summarizing the facts of Jones' murder conviction, and then revealed details of the assault the prior night:

> Besides the murder that occurred and after the murder occurred, [Victim's] body was thrown out into the street by [Jones' girlfriend and they] fled from Springfield and also fled from Lebanon police officers the next day.
>
> The day before the murder occurred are the counts involving the second degree assault and armed criminal action where a man [M.P.], who the defendant and [his girlfriend] were staying with at that time – he was essentially duct-taped to his wheelchair. And he had an amputated leg. He's duct-taped to his wheelchair by [girlfriend], and then [Jones] hit him repeatedly with a croquet mallet, leaving marks and bruises on his arms and legs. And in the photographs, there was a picture where, in the center of his stomach, you could see the imprint of the croquet mallet where the victim, [M.P.], was struck by [Jones]. He was also at another time pistol-whipped by [Jones] either that same night or the next night. And during this assault

8

that happened in the wheelchair with [M.P.] … there was also a pair of underwear that [Jones] urinated on and put over the victim's head before the victim was then pulled out of that wheelchair and allowed to go and return to his bedroom.

In addition, the sentencing court was apprised of other relevant facts in the Sentencing Assessment Report (SAR). The SAR revealed 23 prior criminal convictions. That included eight felony convictions, three of which involved assault. The SAR detailed Jones' extensive criminal history and history of substance abuse, including the use of methamphetamine, marijuana, and alcohol. The report also stated that Jones had a juvenile arrest for selling drugs at school in eighth grade.

While arguing for lower sentences for Jones, Dempsey pointed out that "every single thing that he's had an issue with all stems from one thing, and that is a horrible, horrible meth addiction he's had for most of his life." Dempsey acknowledged that the court needed to give Jones a "significant sentence" and recommended the court sentence Jones to 20 years' imprisonment and to run all other sentences concurrently.

The prosecutor, on the other hand, argued that Jones is "dangerous … violent [and] he's assaulted many people[.]" The prosecutor therefore recommended that the court sentence Jones to life for second-degree murder and three years for ACA, with those sentences to run concurrently. He asked for another 10 years for the second-degree assault and three years for the related ACA, to also run concurrently with each other, but consecutively to the first two counts. The court agreed with the State, except that instead of the three years recommended for the first ACA, the court sentenced Jones to 10 years for that count. In all other respects, the court followed the State's recommendations.

At the post-conviction hearing, Dempsey testified that, before sentencing, he reviewed the SAR, interviewed Jones and his girlfriend, and spoke with at least one family

member to gather potential mitigation evidence. Dempsey and Jones decided that the best strategy at sentencing was to try to mitigate the sentence through argument without contradicting the arguments made at trial. Dempsey also said that Jones decided he did not want to present evidence of brain damage at trial or sentencing. Dempsey explained that the problem with arguing brain damage at the sentencing phase "kept coming down to – we had put [Jones] into a position where he was in fear for his life and acted out of fear, not that he gets mad fast, lashes out, and potentially hurts somebody[.]" Dempsey did argue mitigating factors included in the SAR and emphasized Jones' long history of methamphetamine use.

In denying the claim, the motion court concluded that "Dempsey's actions regarding this claim were sound trial strategy and there has been no prejudice demonstrated." With respect to prejudice, the court explained that "no amount of testimony on behalf of [Jones] at sentencing would have changed the outcome given [his] extensive criminal history." The court referred to Jones' eight prior felony convictions as well as previous probation and parole violations. Further, the court also referred to "argument concerning an assault that occurred the day before the murder where [Jones] assaulted another man who was duct taped to a wheelchair."

Jones' second point contends Dempsey was ineffective for failing to call Dr. Heilbronner as a witness during the sentencing phase because his testimony "would have provided crucial mitigation evidence that the judge would have considered in sentencing [Jones]." We disagree.

Jones failed to show he was prejudiced by Dempsey's decision to not call Dr. Heilbronner or any neuropsychologist at sentencing. In order to establish **Strickland's**

prejudice prong in a claim of ineffective assistance of counsel at sentencing, a movant must demonstrate that, but for trial counsel's unprofessional errors, a reasonable probability exists that movant would have received a lesser sentence. *Dawson v. State*, 611 S.W.3d 761, 769 (Mo. App. 2020). Here, any additional mitigating evidence would not have created a reasonable probability that Jones would have received a lesser sentence, given Jones' extensive criminal history. This is especially true in this post-conviction case because the motion court's findings "carry special weight since the motion court also was the trial court[.]" *Joos v. State*, 277 S.W.3d 802, 804 (Mo. App. 2009). When the same person serves as judge at trial and in the post-conviction proceeding, a motion court finding that a witness' testimony "would not have ameliorated the sentence [is] virtually unchallengeable under the clearly erroneous standard." *Cherco v. State*, 309 S.W.3d 819, 831 (Mo. App. 2010). We reach the same conclusion here. The motion court found that "no amount of testimony on behalf of [Jones] at sentencing would have changed the outcome given [Jones'] extensive criminal history." Therefore, Jones failed to prove that he was prejudiced by Dempsey's decision to not call a neuropsychologist to testify at sentencing. For that reason, Point 2 is denied.

*Point 3*

Point 3 contends the motion court clearly erred in denying Jones' claim that his trial counsel was ineffective for failing to object and move for a mistrial after the trial court explained in open court why a juror was excused during the State's case in chief. The following facts are relevant to this point.

During *voir dire*, the prosecutor listed the names of all the witnesses who would be testifying in this case, including J.M., one of the eyewitnesses to the shooting. When the

11

potential jurors were asked if they knew any of the witnesses listed, no one raised his or her hand.

After J.M. testified at trial, juror No. 34 (No. 34), passed a note to the trial court stating that she knew J.M.'s mother, who was sitting in the courtroom. All jurors except No. 34 left the courtroom for a break. No. 34 explained that she recognized J.M.'s mother sitting next to him in the courtroom. J.M.'s mother was an acquaintance of No. 34 from church. No. 34 said that she did not know J.M., but that she had spent time with his mother outside of church on multiple occasions, and that the two of them had discussed J.M. in the past. The trial court then excused No. 34 from the courtroom with instructions not to tell anyone what had been discussed. Dempsey moved to strike No. 34 from the jury, and the trial court granted the motion.

When the remaining jurors returned from recess, the trial court explained what had happened:

> Now, you probably noticed that [No. 34] is not with us anymore. She didn't do anything wrong. The note that she sent up to me after that last witness is because the witness's mother had been in the courtroom, and she says, "I *go to church with his mother*, and his mother and I have talked a little bit" – not about this case, but she didn't make the connection that he was any relation to anybody until the mother sat there. So that's why she's been released.
>
> If we'd known it when we were picking the jury – you know, all those questions that you were asked yesterday – she probably wouldn't have been on the panel. She did nothing wrong. She just – that's why we have alternates. It's, like, okay, we're just going to be safe by letting her go and not worrying about what she might remember or not. So that's why she's no longer with us.

(Emphasis added.) Dempsey did not object to the court's statement that No. 34 went "to church with his mother," nor did he move for a mistrial on that ground.

12

At the evidentiary hearing, Dempsey said that he did not object to the trial court's statement to the jury regarding No. 34 knowing J.M.'s mother from church because he did not believe that the court's statement was objectionable. He did not think the statement warranted a mistrial, and he did not want to draw more attention to the statement by objecting to it. Even if he had approached the bench and objected out of the jury's hearing, Dempsey did not expect a mistrial to be granted. Therefore, the only remedy would have been for the trial court to instruct the jury to disregard the statement, which would have called more attention to it. Dempsey knew the judge would not grant a mistrial "especially because that is a statement commonly said during any jury selection."

The motion court denied this claim and explained that "[t]o imply that simply telling the jurors that another juror was excused because she knew a witness['] mother would lead to a different outcome in the trial is ludicrous." The court found that this claim was "without merit."

Jones' third point contends Dempsey was ineffective for failing to object and move for a mistrial after the trial court explained why the juror was excused because "the court improperly informed the jury that [J.M.'s mother] was friends from church with the excused juror; a mistrial was warranted because [J.M.'s] credibility was a very important issue in the case, and informing the jury that his mother went to church with a fellow juror had a reasonable likelihood of improving his credibility in the eyes of the remaining jurors." We disagree.

Once again, Jones has failed to overcome the presumption that Dempsey's failure to object or move for a mistrial was reasonable trial strategy. Dempsey testified, and the motion court agreed, that the challenged statement could have been "commonly said during

13

any jury selection" and was simply not objectionable. Trial counsel is not ineffective for failing to make a non-meritorious objection. *Zink*, 278 S.W.3d at 188; *Marshall v. State*, 567 S.W.3d 283, 292 (Mo. App. 2019); *see also* *Anderson v. State*, 564 S.W.3d 592, 615 (Mo. banc 2018). Moreover, assuming the statement was improper, it is well recognized that even seasoned trial attorneys will often not object to otherwise improper questions or arguments because it is feared that frequent objections "highlight the statements complained of, resulting in more harm than good." *Barton*, 432 S.W.3d at 754 (citation omitted). Thus, Jones failed to prove that Dempsey's decision to not object, which would have highlighted the challenged statement, was not reasonable trial strategy. For these reasons, the motion court did not clearly err in denying Jones' claim that Dempsey was ineffective for failing to object and move for a mistrial after the court informed the jury of the reason a juror was excused. Point 3 is denied.

The motion court's order denying Jones' amended Rule 29.15 motion is affirmed.


JEFFREY W. BATES, J. – OPINION AUTHOR

WILLIAM W. FRANCIS, JR., P.J. – CONCUR

JACK A. L. GOODMAN, J. – CONCUR

14