David ZINK, Appellant,

v.

STATE of Missouri, Respondent.

No. SC 88279.

Supreme Court of Missouri,
En Banc.

Feb. 24, 2009.

Rehearing Denied March 31, 2009.

William Swift, Office of Public Defender, Columbia, MO, for Appellant.

Chris Koster, Atty. Gen., Andrew W. Hassell, Asst. Atty. Gen., Shaun J. Mackelprang, Asst. Atty. Gen., Jefferson City, MO, for Respondent.

PATRICIA BRECKENRIDGE, Judge.

David Zink appeals the overruling of his Rule 29.15 motion for post-conviction relief from his conviction of first-degree murder and his sentence of death. Because this case involves the death penalty, this Court has jurisdiction. Mo. Const. art. V, sec. 10. On appeal, Mr. Zink claims that the motion court erred in denying his multiple claims of ineffective assistance of counsel, in signing the attorney general's proposed findings, in violating his constitutional rights in giving penalty instructions, and in failing to find that Mr. Zink did not decide knowingly, intelligently and voluntarily to represent himself. He also challenges the constitutional validity of lethal injection. This Court affirms the motion court's judgment.

## I. Factual and Procedural Background

In the early morning hours of July 12, 2001, police responded to the report of a traffic accident near Stafford. On their arrival, they found the victim's car abandoned with the keys in the ignition and the engine running, the headlights and hazard lights on, and the driver's window down. Police found the victim's personal items in the vehicle, including her purse, credit card and medication.

After the evening news broadcast the victim's disappearance, the owner of a motel near Camdenton recognized the victim's picture as the woman who checked into a room with Mr. Zink. The motel owner provided the police with Mr. Zink's motel registration card, and, using this information, the police apprehended Mr. Zink at his home.

After police showed him evidence that placed him near the scene of the abduction, Mr. Zink waived his rights under *Miranda v. Arizona*,[1] and confessed to killing and burying the victim. He led police straight to the spot in a cemetery where he said he buried the victim's body, and the police discovered the body positioned just as Mr. Zink had described. Pathologists found that the victim's neck was broken, she sustained injuries consistent with strangulation and being tied up, and she had eight broken ribs and between 50 and 100 blunt force injuries. Semen found in the victim's anus matched Mr. Zink's DNA, hair samples taken from Mr. Zink's truck matched the victim's hair, and paint left on the victim's car from the accident matched paint from Mr. Zink's truck.

In two videotaped confessions, Mr. Zink described the murder in detail. He said that he rear-ended the victim's car on an exit ramp. In one confession, Mr. Zink told police that the victim voluntarily left

1. *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

the accident scene with him in his truck but later threatened to call police if he did not return her to her vehicle. In another confession, he said that he gave the victim no choice but to get in his truck, but that she willingly went with him after she was in the truck.

After he drove the victim around in his truck, they stayed for a short time at the motel near Camdenton. Mr. Zink then decided to kill the victim because he was worried he would go back to prison if she called the police. He took her to the cemetery and tied her to a tree. He told her to look-up, and then he broke her neck. He strangled her with his hands, and then with a rope, and stuffed her mouth with mud and leaves. He looked for a spot to bury her and then dragged her body to that spot with the rope. Because he was worried that she might revive, he stated that he stabbed the back of her neck with a knife to cut her spinal cord. He then covered the body with leaves, went home to get a shovel, and came back to the cemetery and covered the body with dirt.

The state charged Mr. Zink with first-degree murder. Mr. Zink waived his right to counsel and asserted a voluntary manslaughter defense at trial, but he also allowed standby counsel from the public defender's office to present a diminished capacity defense. The jury found Mr. Zink guilty of first-degree murder.

Counsel from the public defender's office represented Mr. Zink in the penalty phase. The jury found the presence of three statutory aggravators to support its unanimous recommendation for a death sentence: (1) that Mr. Zink had two prior convictions for aggravated rape; (2) that the murder was committed for the purpose of avoiding a lawful arrest; and (3) that the murder involved depravity of the mind and was outrageously and wantonly vile,

horrible and inhuman. The trial court sentenced Mr. Zink to death. On appeal, this Court affirmed. *State v. Zink*, 181 S.W.3d 66 (Mo. banc 2005).

Mr. Zink subsequently filed a *pro se* motion for post-conviction relief under Rule 29.15, which Mr. Zink's counsel later amended to present additional claims. The state filed a motion to dismiss certain claims without an evidentiary hearing, which the motion court granted. The motion court then conducted a five-day evidentiary hearing on Mr. Zink's remaining claims. The motion court denied all claims. Mr. Zink now appeals.

## II. Standard of Review

In reviewing the overruling of a motion for post-conviction relief, the motion court's findings are presumed correct. *Worthington v. State*, 166 S.W.3d 566, 572 (Mo. banc 2005). A motion court's judgment will be overturned only when either its findings of fact or its conclusions of law are clearly erroneous. Rule 29.15(k); *Worthington*, 166 S.W.3d at 572. To overturn, the ruling must leave the appellate court with a "definite and firm impression that a mistake has been made." *Id.*

To be entitled to post-conviction relief for ineffective assistance of counsel, the movant must satisfy a two-prong test. First, the movant must show that his counsel failed to exercise the level of skill and diligence that a reasonably competent counsel would exercise in a similar situation. *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Second, the movant must show that trial counsel's failure prejudiced the defendant. *Id.* Both of these prongs must be shown by a preponderance of the evidence in order to prove ineffective assistance of counsel. *Anderson v. State*, 196 S.W.3d 28, 33 (Mo. banc 2006).

Mr. Zink must overcome a strong presumption that counsel's conduct was reasonable and effective to meet the first prong of the *Strickland* test. *Id.* To overcome this presumption, Mr. Zink must point to "specific acts or omissions of counsel that, in light of all the circumstances, fell outside the wide range of professional competent assistance." *Id.*

Trial strategy decisions only may serve as a basis for ineffective counsel if they are unreasonable. *See id.* The choice of one reasonable trial strategy over another is not ineffective assistance. *Worthington,* 166 S.W.3d at 573. "[S]trategic choices made after a thorough investigation of the law and the facts relevant to plausible opinions are virtually unchallengeable." *Anderson,* 196 S.W.3d at 33 (quoting *Strickland,* 466 U.S. at 690, 104 S.Ct. 2052).

To satisfy the prejudice prong of the *Strickland* test, Mr. Zink must demonstrate that, absent the claimed errors, there is a reasonable probability that the outcome would have been different. *Id.* at 33–34. Regarding a sentence of death, a defendant must show with reasonable probability that the jury, balancing all of the circumstances, would not have recommended the death penalty. *Id.* at 34.

### III. Issues on Appeal

On appeal of the motion court's denial of post-conviction relief, Mr. Zink asserts multiple points of error, some of which include multiple subpoints. His points are consolidated and reordered here for ease of understanding. He asserts that the motion court erred in denying his claims that trial counsel was ineffective for failing to:

(1) obtain a positron emission tomography (PET) scan and present supporting testimony as to the PET scan's relevance; (2) challenge Mr. Zink's competency to stand trial; (3) object to the trial court's ruling that Mr. Zink must wear a shackling device under his clothing throughout the trial; (4) object to certain guilt and penalty phase closing arguments made by the state; (5) object to two individuals serving both as courtroom security and witnesses in the trial; and (6) object to an autopsy report as hearsay evidence in violation of *Crawford v. Washington,* 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004).

In addition to his ineffective assistance of trial counsel claims, Mr. Zink also asserts that: (7) his self-representation was involuntary; (8) the motion court erred by simply signing the attorney general's proposed findings; (9) the penalty instructions given violated his constitutional rights and appellate counsel was ineffective for failing to raise the errors on appeal; and (10) the motion court erroneously denied discovery and a hearing on Missouri's method of lethal injection.

In three separate points, Mr. Zink asserts that the trial court erred in denying him his right to counsel. In those same points, Mr. Zink asserts that trial counsel was ineffective. As claims of trial court error are not cognizable under Rule 29.15 and Rule 29.15 is not a substitute for direct appeal, this Court will not consider Mr. Zink's allegations of trial court error and only will consider his assertions of ineffective assistance of counsel. *Tisius v. State,* 183 S.W.3d 207, 212 (Mo. banc 2006).[2]

2. Claims of trial error may be considered in a Rule 29.15 motion if fundamental fairness requires and then only in rare and exceptional circumstances. *Schneider v. State,* 787 S.W.2d 718, 721 (Mo. banc 1990). No rare and exceptional circumstances exist here to justify such a review.

## 1. PET scan

Mr. Zink first asserts that the motion court clearly erred in denying his claim that trial counsel provided ineffective assistance of counsel by (1) failing to obtain a PET scan of his brain and (2) failing to call Dr. David Preston to testify to its results. He claims that the PET scan would have revealed to the jury that Mr. Zink has "organic anatomical physiological brain damage" and that the trial court should have presented Dr. William Logan's testimony that the brain damage was caused by a childhood fever. This, Mr. Zink asserts, would have confirmed his mental disorders with "hard science" and would have shown that his mental illness is anatomically and physiologically based, not the result of volition. As such, he asserts that the jury would have found that he acted with diminished capacity and found him not guilty of first-degree murder. Alternatively, Mr. Zink argues that had this evidence been presented to the jury at the penalty phase of the trial, the jury would have voted to sentence him to life imprisonment instead of death.

An investigator, a mitigation specialist and a psychologist recommended that Mr. Zink's attorneys arrange for Mr. Zink to undergo a PET scan prior to trial. Ultimately, trial counsel decided not to conduct the PET scan because of time considerations and because of the number of other expert witnesses.[3]

In July 2006, Mr. Zink underwent a PET scan for purposes of his post-conviction proceeding. According to Dr. Preston's testimony presented at the hearing on Mr. Zink's motion, the PET scan involved injecting Mr. Zink with the tracer fluorodeoxyglucose, a glucose-like radioactive compound. The tracer compound localized in the most active areas of Mr. Zink's brain. Mr. Zink's brain then was scanned, and the scans were processed into images indicating levels of activity in areas of Mr. Zink's brain.

Dr. Preston reviewed the PET scan results and produced a report finding that Mr. Zink's brain had: (1) excessive activity in his frontal lobe, the area involved with thinking, executive functions, planning behavior and brain activity; (2) asymmetry between the right and left frontal and parietal lobes; (3) lower activity in the cingulate gyrus, "a main communication between the frontal lobes and the rest of the brain;" and (4) an abnormality in the amygdala, a part of the brain involved in putting measures of risk to events and behavior.

**3.** Multiple experts reviewed Mr. Zink's mental state. While most of the experts that reviewed Mr. Zink agreed as to his diagnosis, there were certain illnesses diagnosed by some but not others. The predominant finding throughout the various testimonies was that Mr. Zink suffered from a narcissistic personality disorder. The findings were as follows: Kenneth Benedict, Ph.D., determined that Mr. Zink suffered from an intermittent explosive disorder, predominantly the hyperactive-impulsive type; dysthymia; and a personality disorder, mixed paranoid and narcissistic type. Mr. Zink, according to his findings, suffered from a history of attention deficit hyperactivity disorder, oppositional defiant disorder, alcohol abuse, cannabis dependence, and nicotine dependence. Cynthia Brooks, Psy. D., a certified forensic examiner, found that Mr. Zink suffered from alcohol abuse, antisocial personality disorder and narcissistic personality disorder. Robert Smith, Ph.D., diagnosed Mr. Zink with alcohol dependence and a narcissistic personality disorder. David Preston, M.D., testified that Mr. Zink most likely suffered from an obsessive compulsive disorder. William Logan, M.D., found that Mr. Zink possessed a personality disorder with narcissistic, paranoid, impulsive and antisocial features and that he also suffered from alcohol dependence. Finally, David Hough, Ph.D., diagnosed Mr. Zink with narcissistic personality disorder and a paranoid personality disorder.

The motion court ruled that trial counsel's decision not to order the PET scan was reasonable and strategic in nature. It found that trial counsel "decided not to expand the scope of the case in order to focus his resources on other issues, including the other mental health experts, after being fully appraised of the possibilities that the PET scan could show." Because trial counsel made the decision with full knowledge of the possible results and decided not to pursue it, the motion court ruled that the decision was strategic in nature and entitled to near-complete deference under *Strickland*. The trial court has the "superior opportunity to determine the credibility of witnesses," and this Court defers to the trial court's factual findings and credibility determinations. *State v. Rousan*, 961 S.W.2d 831, 845 (Mo. banc 1998). As such, this Court accepts the trial court's findings as to trial counsel's knowledge and strategic decisions.

### a. Guilt Phase

 Mr. Zink raised the issue of his personality disorders in the guilt phase to support a diminished capacity defense. Section 552.015.2(8), RSMo 2000,[4] allows a defendant to present evidence of a mental disease or defect to prove the defendant lacked a culpable mental state that is an element of the offense. *State v. Walkup*, 220 S.W.3d 748, 754–55 (Mo. banc 2007). The element of deliberation, defined as "cool reflection for any length of time no matter how brief," is a mental state that distinguishes first- and second-degree murder. *Id.* at 750–51; sections 565.002.3 and 565.020.1. Had Mr. Zink's diminished capacity defense succeeded by showing that a mental disease or defect prevented him from deliberating at the time he murdered the victim, Mr. Zink could have been found guilty of second-degree murder in-

stead of first-degree murder. *See id.* In this appeal, Mr. Zink claims that his trial counsel was ineffective by not ordering a PET scan of his brain, arguing the PET scan evidence would have strengthened his diminished capacity defense and negated the culpable mental state required for first-degree murder.

With respect to the PET scan evidence, the motion court found that:

The evidence about how the test was administered, and the general acceptance of the PET scan procedure in the medical community, was not contested and this Court accepts such as true. This Court finds that Dr. Preston's testimony with regard to his interpretation of the scan, that there was an increase in frontal lobe activity and that there was a decrease in metabolism in the cingulate gyrus and the amygdale, was credible. The Court also finds that Dr. Preston's testimony that he could not link these problems to any specific mental disease or defect, as well as the other doctors' testimony to this effect, was also credible.

The Court finds that the various doctors' conclusions that Dr. Preston's findings corroborated their diagnoses of various personality disorders are not credible because there is no generally accepted scientific method or evidence that these specific defects were the cause of, or related to, any of [Mr.] Zink's mental problems. In fact, this Court finds Dr. Preston's assertion in his report that [Mr.] Zink most likely suffered from obsessive-compulsive disorder, a finding not supported by any other expert testimony and not consistent with the diagnostic criteria for that disorder, telling as to the weakness of the experts' position. None of the ex-

perts enunciated any credible scientific evidence that definitely linked the PET scan findings to [Mr.] Zink's mental condition. The most that can be said is that the PET scan results were consistent with, but not definitively related to, [Mr.] Zink's diagnosed conditions.

Because the PET scan results were, at most, consistent with Mr. Zink's diagnosed conditions and could not demonstrate any definite link to Mr. Zink's behavior at the time of the murder, the motion court held that Dr. Preston's testimony and report could not have aided Mr. Zink in establishing diminished capacity. As such, the motion court ruled that the evidence would have been irrelevant and inadmissible, and counsel cannot be ineffective for failing to introduce inadmissible evidence in the guilt phase of trial.

In his argument, Mr. Zink does not refer to any evidence establishing a direct link between Dr. Preston's findings and his diminished capacity defense. Instead, he references evidence that the PET scan results were consistent with the psychologists' mental disorder diagnoses—intermittent explosive disorder; personality disorder not otherwise specified with narcissistic, paranoid and compulsive features; and alcohol dependence. Mr. Zink asserts, however, that psychology is a "soft" science, and psychologists' findings may be disparaged for not having the concrete verifiability of "hard" sciences. He asserts that the state did so by eliciting from the psychologists that they possessed a Ph.D., not an M.D. Mr. Zink argues that because Drs. Preston and Logan are medical doctors, their testimony would have offered "hard" scientific evidence to confirm the "soft" science diagnoses.

■ To prevail on a claim of ineffective assistance of counsel for failure to locate and call an expert witness, the movant must show that: (1) such an expert witness existed at the time of trial; (2) the expert witness could be located through reasonable investigation; and (3) the expert witness's testimony would have benefited the defense. *State v. Davis*, 814 S.W.2d 593, 603–04 (Mo. banc 1991). In this case, the first two conditions are satisfied. In regard to the third condition, that the witness's testimony would have benefited the defense, Mr. Zink has failed to show there is generally accepted scientific evidence to link the PET scan results to any of Mr. Zink's diagnosed personality disorders.

The PET scan results show differing levels of activity in certain portions of Mr. Zink's brain compared to normal brain activity, and Dr. Preston testified that these abnormalities can be associated with some behavioral traits. Dr. Preston testified, however, that the PET scan neither would confirm nor deny personality disorders. He stated that PET scans usually were not used to diagnose mental disorders and that he instead would defer to the psychiatrist or neurologist. Dr. Logan, a psychiatrist, testified that there is no generally accepted scientific evidence as to what portions of the brain or brain deficits caused Mr. Zink's personality disorders because the research is not yet that advanced. Dr. Logan would "consider" PET scan results in making a diagnosis but would not rely on them. Further, Dr. Logan testified that narcissistic personality disorder and paranoid personality disorder originate in the person's childhood and social experiences. Dr. Logan stated that "one of the frontiers of our knowledge is that we don't know what degree that personality styles are inherited or maybe even influenced by things like his meningitis that may have created some brain damage." Likewise, both psychologists, Dr. Kenneth Benedict and Dr. Robert Smith, testified that there was no one-to-one cor-

relation between PET scan results and Mr. Zink's personality disorders, only that the PET scan results could be related to certain patterns of behavior.

■ The significance of the results of scientific procedures "may be admitted only if the procedure is sufficiently established to have gained general acceptance in the particular field in which it belongs." *State v. Kinder*, 942 S.W.2d 313, 326 (Mo. banc 1996) (internal quotations omitted). The results of PET scans for determining personality disorders or mental disorders has not gained general acceptance in the field of psychology. Only those principles and tests that have gained scientific acceptance in the scientific community are reliable. *See State v. Erwin*, 848 S.W.2d 476, 480 (Mo. banc 1993). The results of such a scan, therefore, would be inadmissible as they would pertain to Mr. Zink's personality disorders.

In sum, Mr. Zink fails to show that the PET scan testimony was admissible. Counsel is not ineffective for failure to obtain and introduce evidence in the guilt phase that would not be admissible. *See Williams v. State*, 168 S.W.3d 433, 441 (Mo. banc 2005). Mr. Zink, as such, has not demonstrated that counsel was ineffective for failing to order the PET scan and present supporting testimony in the guilt phase.

■ Additionally, even if the PET scan testimony would have been admissible to confirm Mr. Zink's personality disorders, the outcome of the trial would not have been different unless his personality disorders caused him not to act with deliberation in murdering the victim.[5] Evidence that Mr. Zink killed with deliberation, however, was very strong. "Deliberation for purposes of proving

murder in the first degree occurs if the actor had time to think and intended to kill the victim for any period of time." *State v. Hudson*, 154 S.W.3d 426, 429 (Mo.App.2005). Deliberation ordinarily is established through circumstances surrounding the crime. *State v. Strong*, 142 S.W.3d 702, 717 (Mo. banc 2004).

Mr. Zink was calm and articulate in speaking to police in a videotaped confession less than a month after the murder. In that confession, Mr. Zink said that he killed the victim because he was worried he would go back to prison if she told the police that he raped her. He stated that if he was going to have to go back to prison, it would be for a good reason. As he drove to the cemetery, he told the victim that he would tie her up and leave her in a barn for the police to find her. He expressed in the confession that she should have known he was going to kill her when they pulled up to the secluded cemetery because it was obvious at that point what was going to happen.

When they arrived at the cemetery, he tied the victim to a tree. In Mr. Zink's videotaped confession, he told her that he was going to have to kill her because she knew his name. Mr. Zink stated that he stopped and thought about what would be the best way to kill her. He told her to look up, and then he broke her neck with his hands. Mr. Zink testified at trial that, after breaking her neck, he strangled the victim with his hands and then with a nylon cord. He stuffed leaves and mud into her mouth. He next dragged her down a hill and covered up the body. Approximately 10 minutes after breaking her neck, Mr. Zink pulled out his pocket knife and stabbed the back of her neck to sever the spinal cord because he thought she

---

**5.** A defendant commits first-degree murder "if he knowingly causes the death of another person after deliberation upon the matter." Section 565.020.1.

might revive. He then went home, got a shovel and returned to the cemetery to bury the body. The victim's body was bruised significantly, indicating that Mr. Zink had struck her between 50 and 100 times before her heart stopped beating.

Because there is overwhelming evidence that Mr. Zink acted with deliberation, this Court agrees with the motion court's finding that there is no reasonable probability that the PET scan evidence would have resulted in the jury returning a verdict of not guilty on the charge of first-degree murder.

### b. Penalty Phase

■ Mr. Zink also argues that had this evidence been presented to the jury at the penalty phase of the trial, the jury would have voted to sentence him to life imprisonment instead of death. As with the guilt phase, Mr. Zink claims that Dr. Preston's testimony would have confirmed, with an M.D.'s expertise, Dr. Benedict's personality disorder diagnoses. He also claims that Dr. Logan's testimony would have confirmed that Mr. Zink's personality disorders "were not a personal volitional choice" because Dr. Logan identified from Mr. Zink's childhood medical records that he had a high fever associated with meningitis and the mumps.

■ As discussed above, because there is no direct link between the PET scan evidence and Mr. Zink's personality disorders, the PET scan evidence does not "confirm" Mr. Zink's personality disorders. The PET scan evidence, however, still would have mitigating value. " 'Virtually no limits are placed on the relevant mitigating evidence a capital defendant may introduce concerning his own circumstances.' " *Hutchison v. State*, 150 S.W.3d 292, 304 (Mo. banc 2004) (quoting *Tennard v. Dretke*, 542 U.S. 274, 285, 124 S.Ct. 2562, 159 L.Ed.2d 384 (2004)). "[T]he

question is simply whether the evidence is of such a character that it might serve as a basis for a sentence less than death." *Tennard*, 542 U.S. at 287, 124 S.Ct. 2562 (internal quotations omitted). Evidence of an organic brain abnormality, therefore, can be mitigating.

Furthermore, to establish ineffective assistance of counsel, the movant must do more than demonstrate there was evidence that existed that was not presented. Counsel has limited time and resources, and if there is a strategy that does not look promising, he may "cho[o]se not to expend his limited resources to that end. This is a reasonable strategic decision." *State v. Brown*, 902 S.W.2d 278, 298 (Mo. banc 1995).

Even if trial counsel here was deficient in failing to present this additional mitigating evidence, counsel is not ineffective unless the failure to investigate and present the mitigating evidence was prejudicial to Mr. Zink. "It is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding.... [N]ot every error that conceivably could have influenced the outcome undermines the reliability of the result of the proceeding." *Strickland*, 466 U.S. at 693, 104 S.Ct. 2052. "To prove ineffectiveness with regard to death penalty sentencing, [Mr. Zink] must show that, but for his counsel's ineffective performance, there is a reasonable probability that the jury would have concluded after balancing the aggravating and mitigating circumstances, death was not warranted.' " *Anderson*, 196 S.W.3d at 34 (quoting *Rousan v. State*, 48 S.W.3d 576, 582 (Mo. banc 2001)). *See also Strickland*, 466 U.S. at 696, 104 S.Ct. 2052.

The jury unanimously found three statutory aggravating circumstances: (1) Mr. Zink had two prior serious assaultive con-

victions for aggravated rape;[6] (2) he murdered the victim for the purpose of avoiding a lawful arrest; and (3) the murder involved depravity of mind and was outrageously and wantonly vile, horrible and inhuman. *Zink*, 181 S.W.3d at 75. Mr. Zink was on parole at the time he committed the murder, serving concurrent 30–year sentences for two aggravated rape convictions. In his taped confessions, he admitted to killing the victim because he was afraid he would go back to prison if she called the police. The motion court found that these confessions showed Mr. Zink as "cold, callous, and calculating." The state also presented evidence that Mr. Zink has two additional convictions in Texas for aggravated rape and a federal conviction for kidnapping for ransom.

Sixteen witnesses testified on Mr. Zink's behalf in the penalty phase. Mr. Zink's mitigating evidence included expert testimony that he has psychological disorders rooted in his family history and poor emotional development from negative circumstances in his childhood—inadequate parental attachment, parental alcohol abuse, chronic domestic conflict, emotional abuse, abandonment and sexually traumatic exposures. The defense presented evidence that Mr. Zink is a caring person and a hard worker. The evidence also showed that he has counseled other inmates in prison and that he is a low-risk inmate.

In light of the evidence, there is no reasonable probability that Dr. Preston's testimony and the PET scan would have persuaded the jury to impose a punishment less than death. First, the mitigating value of the PET scan evidence is limited because, as discussed above, there is no generally accepted scientific link between Mr. Zink's brain abnormalities and his diagnosed personality disorders.

Second, even if the PET scan results did support the personality disorder diagnoses, Mr. Zink's cognitive abilities are normal. Mr. Zink's own experts testified that he has above-average intelligence and the ability to take in and process information in an intelligent way. Where personality disorders do not affect cognitive abilities, their mitigating value is doubtful. *See, e.g., Schneider v. Delo*, 85 F.3d 335, 340–41 (8th Cir.1996) (no prejudice in attorney failing to admit evidence of defendant's attention-deficit disorder and insomnia in penalty phase when cognitive abilities were normal and there was no evidence of schizophrenia or bipolar disorder); *Whitmore v. Lockhart*, 8 F.3d 614, 617 (8th Cir.1993) (attorney not ineffective for failing to introduce evidence of defendant's anti-social personality disorder in penalty phase when he suffered no mental impairment that would negate his responsibility); and *Guinan v. Armontrout*, 909 F.2d 1224, 1229 (8th Cir.1990) (highly doubtful that evidence of defendant's anti-social personality disorder would be considered mitigating by jury). Similarly, the mitigating value of brain abnormality evidence itself, apart from the personality

6. The victims of the prior rape and kidnapping convictions appeared and testified in the penalty phase. One victim testified that Mr. Zink aggressively pursued her car on a Dallas, Texas, freeway. She thought she lost him and drove home. As she was getting out of her car, he kidnapped her with a knife. The other was trapped by Mr. Zink while in a telephone booth, and he forced her back to his apartment with a knife at her throat. The evidence was that these offenses involved multiple rapes of each victim and multiple forced sexual acts, including oral sex. One victim was sexually assaulted using a carrot, cucumber, potato and a Coke bottle, in addition to multiple acts of forced sexual intercourse. Mr. Zink made death threats against both victims, and he informed one victim that he would murder anyone she asked for help. He used a knife against both victims' throats to force them to do what he demanded.

disorder diagnoses, is limited because there was no evidence that Mr. Zink's intellectual functioning was impaired.

Finally, the aggravating factors in this case are very weighty. This was a horrific murder that Mr. Zink admitted committing to avoid a lawful arrest. Evidence showed that Mr. Zink has two prior aggravated rape convictions in which he kidnapped and brutally raped women multiple times. Given the overwhelming aggravating factors, there is no reasonable probability that the omitted evidence would have changed the jury's conclusion as to punishment. *See Strickland,* 466 U.S. at 700, 104 S.Ct. 2052.

### 2. Competency to Stand Trial

Mr. Zink claims that the motion court clearly erred in failing to find trial counsel ineffective for not challenging his competency to stand trial. Section 552.020.1 states that "[n]o person who as a result of mental disease or defect lacks capacity to understand the proceedings against him or to assist in his own defense shall be tried, convicted or sentenced for the commission of an offense so long as the incapacity endures." In addition, this Court has held, "The standard for competence to stand trial is whether the defendant has 'sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding' and has 'a rational as well as factual understanding of the proceedings against him.'" *State v. Tokar,* 918 S.W.2d 753, 762 (Mo. banc 1996) (quoting *Dusky v. United States,* 362 U.S. 402, 80 S.Ct. 788, 4 L.Ed.2d 824 (1960)). A defendant is presumed competent to stand trial, and the burden is on the defendant to show he is incompetent. *Edwards v. State,* 200 S.W.3d 500, 519 (Mo. banc 2006).

Mr. Zink asserts that his trial counsel were ineffective when they seriously questioned whether Mr. Zink was competent to stand trial. He alleges they believed his mental impairments made it impossible for him to sufficiently consult with them, but they did not request a competency evaluation. Mr. Zink's arguments in support of this claim of error rely on testimony from the evidentiary hearing by his trial attorneys that they thought Mr. Zink was not competent because Mr. Zink insisted on presenting the defense of voluntary manslaughter when trial counsel did not believe that defense was supported by the evidence and because the evidence Mr. Zink thought proved provocation for sudden passion was detrimental to him and would aid the state in convicting him of first-degree murder. The motion court found this testimony not to be credible.

"A person commits the crime of voluntary manslaughter if he ... [c]auses the death of another person under circumstances that would constitute murder in the second degree under subdivision (1) of subsection 1 of section 565.021, except that he caused the death under the influence of sudden passion arising from adequate cause." Section 565.023.1. "Sudden passion" is defined as "passion directly caused by and arising out of provocation by the victim or another acting with the victim which passion arises at the time of the offense and is not solely the result of former provocation." Section 565.002(7). "Adequate cause" is defined as that "cause that would reasonably produce a degree of passion in a person of ordinary temperament sufficient to substantially impair an ordinary person's capacity for self-control[.]" Section 565.002(1).

His lead trial attorney testified that he believed Mr. Zink was incompetent because Mr. Zink's mental illness kept him from understanding that his fear that the victim would report him to the police and he would be sent back to prison was not

legally sufficient "provocation" for "sudden passion," a necessary element of the offense of voluntary manslaughter. Sections 565.002(7) and 565.023. Mr. Zink also relies on the testimony of expert witnesses that Mr. Zink's personality disorders prevented him from rationally consulting with counsel "because his rigid, inflexible thinking causes him to hyper-focus on insignificant details, and thereby, fail to grasp the larger picture."

As noted above, the motion court found that this evidence was not credible and, instead, found credible the testimony of the doctor who conducted the only chapter 552 competency examination. In the competency examination the court ordered prior to trial, Dr. Brooks found that Mr. Zink was competent. She determined that, to a reasonable degree of psychological certainty, Mr. Zink suffered from alcohol abuse, antisocial personality disorder and narcissistic personality disorder. Dr. Brooks further found that, despite these disorders, Mr. Zink's personality disorders were not the type of mental illnesses that rendered an individual incompetent under chapter 552. Mr. Zink's lead trial attorney testified that he did not agree with Dr. Brooks' findings, but he did not request an additional competency examination because he believed the trial court could find Dr. Brooks' findings credible. That was a correct assessment of that evidence.

There was also testimony from all the mental health experts that Mr. Zink had the cognitive ability to understand the function of the prosecutor, his attorneys, the judge and his possible defenses. The record clearly demonstrates that Mr. Zink was intelligent and interested in formulating strategy about his defense. It also demonstrates that his trial counsel disagreed with that strategy and shows how

Mr. Zink responded to that disagreement. Initially, Mr. Zink wanted to pursue a defense of justification. For some period of time, he was not dissuaded from that defense even though his counsel told him that justification was not available as a defense to homicide. He eventually did abandon the justification defense, as advocated by his counsel, but he then decided to pursue the defense of voluntary manslaughter, asserting that his actions were the result of sudden passion provoked by the victim's likelihood of causing him to return to prison. He would not agree that the defense recommended by his counsel, diminished capacity, be presented and undertook, instead, to represent himself. On the day of trial, however, he accepted the advice of his counsel and agreed that he would permit the public defenders to present the defense of diminished capacity along with the defense he was presenting—voluntary manslaughter. When the jury found him guilty of first-degree murder, he changed his decision to represent himself with the public defender only acting as stand-by counsel and agreed that the public defenders should represent him in the penalty phase of the trial.

Despite Mr. Zink's failure to accept his counsel's advice to let them represent him and present the sole defense of diminished capacity, Mr. Zink's decisions and conduct during the trial show that he did consider and follow other advice of counsel when deciding what defense to pursue and whether to represent himself. His decisions and conduct during the trial refuted the experts' testimony that his personality disorders prevented him from rationally consulting with counsel "because his rigid, inflexible thinking causes him to hyperfocus on insignificant details, and thereby, fail to grasp the larger picture." [7]

7. This evidence also contradicts Mr. Zink's

allegation that his mental illness caused an

■ The motion judge, who also served as the trial judge, also relied on his own observations during the case to determine that Mr. Zink was capable of rationally consulting with trial counsel and that he understood the proceedings and his possible defenses.[8] In its judgment, the motion court referred to the extensive 50 page colloquy the judge had with Mr. Zink when Mr. Zink chose to represent himself, finding that:

> [T]his Court is more than satisfied that [Mr.] Zink understood the significance and consequences of his decisions at the time of trial. [Mr.] Zink's ability to converse with the Court at the time of trial about the law relating to his case also demonstrates that he had the ability to conduct a rational conversation with his attorneys.

Given all of the aforementioned evidence, the record supports the motion court's finding that trial counsel's decision not to request an additional competency examination was reasonable, when viewed from trial counsel's perspective at the time of trial. Further, the record supports the motion court's finding that, even if counsel had challenged Mr. Zink's competency to stand trial, Mr. Zink would not have been found incompetent. Mr. Zink, therefore, cannot show prejudice. The motion court did not err in refusing to find trial counsel

ineffective for not challenging Mr. Zink's competency to stand trial.

### 3. Hidden Leg Restraint

■ Mr. Zink asserts that the motion court clearly erred in failing to find trial counsel ineffective for not objecting to the sheriff's requirement that Mr. Zink wear a leg restraint under his pants during trial. The motion court found there was no credible evidence that the jury ever saw the restraint. Mr. Zink did walk with an altered gait throughout the trial, however, because the device prevented him from fully straightening his leg. The jurors who testified via deposition explicitly stated that the restraint was not visible but that, because of his gait, they believed he was wearing a shackling device that was not openly visible. Defense counsel stated he did not object because he thought the shackling device did not impair Mr. Zink's movement substantially. The motion court found there was no violation of Mr. Zink's rights.

In support of his claim, Mr. Zink cites a recent holding of the United States Supreme Court, *Deck v. Missouri*, where the Court addressed the shackling of the defendant during trial. 544 U.S. 622, 630–33, 125 S.Ct. 2007, 161 L.Ed.2d 953 (2005). In *Deck*, from the first day of the defendant's proceeding and throughout, he was shackled with visible leg irons, handcuffs and a

---

inability to change his mind once he made a decision. Interestingly, Mr. Zink presents evidence that a public defender who served as lead counsel during the pendency of his case was unwilling to change her mind as to trial strategy once it was made up. Her attitude was characterized as a negative trait for a trial attorney but he certainly did not suggest that it was evidence she was mentally incompetent.

8. When communication problems are caused by the defendant's desire to control the defense, as opposed to mental impairments, and

there is no indication that the defendant is generally incapable of cooperating with counsel, the defendant does not demonstrate that he is incompetent to stand trial. *Edwards*, 200 S.W.3d at 520. *See also Ferry v. State*, 453 N.E.2d 207, 212 (Ind.1983) (holding that the test of competency to stand trial is whether defendant has the ability to assist in preparing his defense, not whether defendant is willing to assist). Mr. Zink's strained relationship with trial counsel, and its affect on his communications with trial counsel, does not render him incompetent to stand trial.

belly chain. *Id.* at 622, 125 S.Ct. 2007. The Court found that the due process clause prohibits the routine use of visible shackles during guilt and penalty phases of trial but that shackling may be justified based on the particulars of the circumstance. *Id.* at 633, 125 S.Ct. 2007 The Court emphasized that "where a court, without adequate justification, orders the defendant to wear shackles *that will be seen* by the jury, the defendant need not demonstrate actual prejudice to make out a due process violation." *Id.* at 635, 125 S.Ct. 2007 (emphasis added).

The Supreme Court's decision in *Deck* does not aid Mr. Zink's claim of ineffective assistance of trial counsel. First, the nature of the restraint of Mr. Zink differs significantly from that in the *Deck* case. Mr. Zink was required to wear a knee brace that was not visible to the jury because it was concealed by his pants, whereas Mr. Deck was visibly restrained by a belly chain, leg irons and handcuffs. Mr. Deck's shackles were blatant and strongly implied to the jury that Mr. Deck was a dangerous man who needed to be restrained. In contrast, Mr. Zink was well dressed, and his appearance did not convey that he was dangerous; one juror who testified by deposition stated that Mr. Zink looked as though he could have been appearing on a bad check charge.

Mr. Zink argues that a due process violation still occurs when a defendant is forced to wear a leg brace under his pants and the jury sees the effects of the restraint. The Supreme Court's decision in *Deck* is not authority for that proposition. In *Deck,* the Supreme Court discussed the historical development of the law regarding the shackling of a criminal defendant in the guilt phase of a criminal trial. In its discussion, it noted that "[t]he law has long forbidden the routine use of *visible* shackles during the guilt phase; it permits a State to shackle a criminal defendant only in the presence of a special need." *Id.* at 626, 125 S.Ct. 2007 (emphasis added). In its principle holding, the Supreme Court ruled that:

> [T]he Fifth and Fourteenth Amendments prohibit the use of physical restraints visible to the jury absent a trial court determination, in the exercise of its discretion, that they are justified by a state interest specific to a particular trial. Such a determination may of course take into account the factors that courts have traditionally relied on in gauging potential security problems and the risk of escape at trial.

*Id.* at 629, 125 S.Ct. 2007. There is further indication that the Court's ruling was limited to restraints that are visible, in that it expressly noted that the trial court did not explain "why, if shackles were necessary, [the trial court] chose not to provide for shackles that the jury could not see—apparently the arrangement used at trial." [9] *Id.* at 634–35, 125 S.Ct. 2007.

---

**9.** Several jurisdictions have considered whether the holding of *Deck* regarding visible shackles should be extended to shackles that are not visible, but there is not unanimity in their decisions. A number of courts emphasize *Deck's* application to *visible* restraints, not covered restraints. *See Garnett v. Morgan,* No. C05–1438MJP, 2008 WL 217719, slip op. at 8–9 (W.D.Wash.2008); *Wrinkles v. Buss,* 537 F.3d 804 (7th Cir.2008); *United States v. Miller,* 531 F.3d 340, 347–48 (6th Cir.2008); *United States v. Howard,* 480 F.3d 1005, 1012 (9th Cir.2007); *Sager v. Hall,* No. 05–CV–1812–AC, 2008 WL 2536821, slip op. at 7 (D.Or.2008); *James v. Lamarque,* No. C 02–4606, 2006 WL 2501542, slip op. at 8 (N.D.Cal.2006). *But see United States v. Baker,* 432 F.3d 1189, 1244 (11th Cir.2005) (applying *Deck* where restraints were not visible to jury); *United States v. Waagner,* 104 Fed. Appx. 521, 526, 2004 WL 1595193 (6th Cir. 2004) (considering same factors whether or not restraints were visible to jury).

More importantly, *Deck* does not support Mr. Zink's claim that his trial counsel was ineffective for failure to object to the shackling of Mr. Zink because Mr. Zink was tried in July 2004, prior to the *Deck* decision. It was not until October 2004 that the United States Supreme Court granted certiorari, *Deck v. Missouri*, 543 U.S. 942, 125 S.Ct. 360, 160 L.Ed.2d 253 (2004), and not until 2005 that the Court ruled, as discussed, that a criminal defendant shall not be visibly shackled during a jury trial unless there are particular concerns regarding the individual defendant, such as security concerns, that demonstrate the special need for shackling. *Deck*, 544 U.S. at 633, 125 S.Ct. 2007.

"In reviewing an ineffective assistance of counsel claim, counsel's conduct is measured by what the law is at the time of trial." *Glass v. State*, 227 S.W.3d 463, 472 (Mo. banc 2007). "Counsel will generally not be held ineffective for failing to anticipate a change in the law." *Id.* (citing *State v. Parker*, 886 S.W.2d 908, 923 (Mo. banc 1994)). Mr. Zink's trial occurred prior to the Supreme Court's ruling in *Deck* that changed the law regarding visible shackles.[10] Trial counsel, therefore, was not ineffective for failing to object to Mr. Zink's concealed leg brace.

### 4. Guilt and Penalty Phase Closing Arguments

Mr. Zink asserts that trial counsel was ineffective for failing to object to various arguments made by the prosecutor during the guilt and penalty phase closing arguments. The motion court held that Mr. Zink failed to prove ineffective assistance.

#### a. Guilt Phase

■ Mr. Zink contends that trial counsel should have objected to three statements made by the prosecutor in the guilt phase closing arguments: (1) that Mr. Zink was attempting to "feed" into a diminished capacity defense through his actions during trial; (2) that the jury had a duty to return justice—"do your duty;" and (3) that so long as Mr. Zink deliberated for even a "millisecond," it constituted deliberation for purposes of a conviction.

■ An attorney's failure to object during closing arguments only results in ineffective assistance of counsel if it prejudices the accused and deprives him of a fair trial. *State v. Clemons*, 946 S.W.2d 206, 228 (Mo. banc 1997). Even assuming, *arguendo*, that defense counsel should have objected to any statements made in the prosecutor's guilt phase closing arguments, Mr. Zink cannot demonstrate prejudice. Mr. Zink twice admitted to police that he murdered the victim. He led police to the body. He described his actions and thought process that resulted in her death. Mr. Zink's guilt, by his own admission, is indisputable. Mr. Zink, therefore, suffered no prejudice as a result of the prosecutor's guilt phase closing arguments.

#### b. Penalty Phase

Mr. Zink's contention that he suffered prejudice due to the prosecutor's penalty phase arguments also fails. Mr. Zink contends that counsel should have objected to false statements about William Tecumseh Sherman, Civil War General, and to four specific statements during the penalty

10. Mr. Zink asserts that because appellate counsel was involved with both Mr. Deck's case and his own, counsel should have known that the United States Supreme Court might grant certiorari in *Deck* and, therefore, should have objected. Knowledge of appellate counsel is irrelevant because it is trial counsel, not appellate counsel, who is responsible for objections at trial. In any event, Mr. Zink cites no authority that to be competent counsel is obligated to anticipate a grant of certiorari and object accordingly.

phase arguments: (1) "I will always seek the death penalty when you kill a little girl;" (2) "The only thing I can tell you is that if this is not a situation for the death penalty, all these facts and aggravation taken as a whole, I cannot imagine what is;" (3) that the death penalty "is societal self-defense. We have the right to remove the predators from the sheep;" and (4) "You are the ones who will decide whether society is going to defend itself from this man [pointing at Mr. Zink]."

In his Rule 29.15 motion, Mr. Zink asserts that counsel should have objected to the argument about General Sherman because it was based on facts not in evidence, personal opinion, and appealed solely to passion and prejudice. Because Mr. Zink did not challenge the accuracy of these statements below, this Court may only consider whether counsel should have objected. This Court, therefore, must consider whether counsel should have objected to any of these penalty phase arguments and, if so, whether such failure to object prejudiced Mr. Zink and deprived him of a fair trial. *Clemons*, 946 S.W.2d at 228.

As to the argument made concerning General Sherman, the motion court found the point of this argument, which was to emphasize that people with difficult backgrounds still can grow into successful adults, was permissible. This Court agrees and need not assess the accuracy of the information given. The first and second challenged statements during the penalty phase arguments, (1) and (2), constituted the prosecutor's personal opinion as to whether the death penalty should be imposed, and such opinions are permissible provided they are based fairly on the evidence. *See State v. Edwards,* 116 S.W.3d 511, 547 (Mo. banc 2003). With regard to statements (3) and (4), an "argument of societal self-defense, has previous-

ly been upheld by this Court and the United States Supreme Court as being permissible and not violative of a defendant's rights to a fair trial." *State v. Forrest,* 183 S.W.3d 218, 228 (Mo. banc 2006) (footnote omitted). "Prosecutors may discuss the concept of mercy in their closing arguments because mercy is a valid sentencing consideration, and in that connection may argue that the defendant should not be granted mercy." *Id.* "Mere failure to object is not ineffective assistance of counsel, and trial counsel is not ineffective for failing to make non-meritorious objections." *State v. Lewis,* 874 S.W.2d 420, 427 (Mo.App.1994) (citations omitted). Because objections to these statements would lack merit, there was no ineffective assistance of counsel.

Furthermore, even if defense counsel should have objected to any statements made in the prosecutor's penalty phase closing arguments, Mr. Zink fails to demonstrate any prejudice. Mr. Zink "must show there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strong v. State,* 263 S.W.3d 636, 647 (Mo. banc 2008) (internal citations omitted). Mr. Zink cannot meet this burden and, therefore, there is no ineffective assistance of counsel.

### 5. Courtroom Security as Witnesses

At his Rule 29.15 hearing, Mr. Zink informed the motion court of his desire to dismiss three claims from his amended petition, including a claim addressing the issue that certain individuals served as courtroom security during the proceedings but also served as witnesses in the proceeding itself. The court discussed the ramifications of such a dismissal with Mr. Zink and questioned Mr. Zink to ensure he had sufficient time to discuss such dismissals with his attorneys. Mr. Zink stated

that he had sufficient time to discuss the matter with his attorneys, understood the consequences of such a dismissal with prejudice, and still desired to dismiss three specific claims, including a claim regarding individuals serving both as courtroom security and as trial witnesses.

■ Mr. Zink now asserts that he was incompetent to proceed at his Rule 29.15 hearing and, therefore, that the motion court should not have dismissed his claims and counsel was ineffective for allowing such dismissal despite Mr. Zink's explicit request that the claims be dismissed. A claim of ineffective assistance of post conviction counsel is categorically unreviewable. *State v. Lyons,* 129 S.W.3d 873, 874 (Mo. banc 2004).

### 6. Autopsy Report

■ Mr. Zink asserts that trial counsel was ineffective for failing to object to testimony from a medical examiner about an autopsy report and the prosecutor's closing argument concerning the autopsy report and the medical examiner's testimony.[11] At trial, the medical examiner who conducted the autopsy was unavailable because he was seriously ill with cancer. A different medical examiner—who had read the report, examined autopsy photographs of the victim and discussed the autopsy with the preparer of the report—testified as to the contents of the report. Mr. Zink asserts that this testimony and closing argument about the autopsy violated his

right to confrontation as recognized by the United States Supreme Court in *Crawford v. Washington.*

In *Crawford,* the Court found that testimonial hearsay is inadmissible unless the defendant had a prior opportunity to cross-examination the declarant and the declarant was unavailable at trial. 541 U.S. at 68, 124 S.Ct. 1354. This Court summarized the significance of the *Crawford* holding in *Glass v. State:*

> In *Crawford,* the Court substantially altered the Confrontation Clause analysis for hearsay evidence. Cases before *Crawford* focused on whether the evidence at issue had adequate indicia of reliability to justify admission. The *Crawford* opinion held that the Confrontation Clause protects a defendant from the use of testimonial hearsay as substantive evidence against him, unless the non-testifying witness is unavailable, and the defendant has a prior, meaningful opportunity to cross-examine that witness. The Confrontation Clause analysis thus centers on whether the particular evidence at issue is "testimonial" in nature.

227 S.W.3d 463, 472 (Mo. banc 2007) (citations omitted).

In its *Crawford* opinion, the Supreme Court expressly left "for another day any effort to spell out a comprehensive definition of 'testimonial,'" but found that "[w]hatever else the term covers, it applies at a minimum to prior testimony at a

---

11. In his point relied on, Mr. Zink does not assert that his counsel was ineffective for failure to object to the admission into evidence of the autopsy report, which was admitted into evidence. The testimony of the medical examiner about the autopsy report would be cumulative of the report itself, so the admission of the autopsy report would eliminate any prejudice from trial counsel's failure to object to testimony and oral argument concerning the report. *See State v. Lopez,* 128

S.W.3d 195, 202 (Mo.App.2004) (emphasizing that "[w]hen evidence challenged on constitutional grounds is cumulative of other properly-admitted evidence, the disputed evidence could not have contributed to the defendant's conviction and is harmless beyond a reasonable doubt"). Nevertheless, this Court gratuitously will consider Mr. Zink's claim of error as though he includes the claim his counsel was ineffective in failing to object to the admission of the autopsy report.

preliminary hearing, before a grand jury, or at a former trial; and to police interrogations." *Crawford,* 541 U.S. at 68, 124 S.Ct. 1354. The Supreme Court "set forth '[v]arious formulations' of the core class of 'testimonial' statements, but found it unnecessary to endorse any of them, because 'some statements qualify under any definition.'" *Davis v. Washington,* 547 U.S. 813, 822, 126 S.Ct. 2266, 165 L.Ed.2d 224 (2006) (quoting *Crawford,* 541 U.S. at 51–52, 124 S.Ct. 1354) (citations omitted). The majority opinion noted the criticism of the dissent that its refusal to comprehensively define "testimonial" would cause "interim uncertainty" and responded that "it can hardly be any worse than the status quo." *Crawford,* 541 U.S. at 68 n. 10, 124 S.Ct. 1354.

Mr. Zink's trial occurred four months after the *Crawford* decision and, at that time, there was no precedent in Missouri that an autopsy report is testimonial in nature and the protections of *Crawford* would apply. In fact, at the time of Mr. Zink's trial, only Alabama had addressed whether an autopsy report was testimonial in nature. *See Perkins v. State,* 897 So.2d 457 (Ala.Crim.App.2004); *Smith v. State,* 898 So.2d 907 (Ala.Crim.App.2004). The unsettled state of the law as to what constitutes "testimonial" statements under *Crawford* was, again, recognized in a later Supreme Court decision, *Davis v. Washington,* where the Court addressed whether statements made during a 911 call and statements made to a police officer responding to a dispatch for a domestic disturbance were testimonial. 547 U.S. at 817–20, 822, 126 S.Ct. 2266. The Court held that a statement is "testimonial" when the "primary purpose" of the interrogation is not to respond to an ongoing emergency but "to establish or prove past events potentially relevant to later criminal prosecution." *Id.* at 822, 126 S.Ct. 2266.

It was 2007 before a Missouri intermediate appellate court held that an autopsy report was testimonial. *State v. Davidson,* 242 S.W.3d 409, 417–18 (Mo.App.2007). To date, this Court has not ruled on the issue, although it has held that a laboratory report that identified a substance seized as cocaine base was testimonial because it was prepared for use in prosecution and, in so ruling, cited cases pertaining to autopsy reports. *State v. March,* 216 S.W.3d 663, 666–67 (Mo. banc 2007). In so ruling, this Court applied the "primary purpose" standard from *Davis* that was adopted long after Mr. Zink's trial. *Id.* at 666.

■ As previously noted, counsel's conduct is measured by what the law is at the time of trial. *Glass,* 227 S.W.3d at 472. "Counsel will generally not be held ineffective for failing to anticipate a change in the law." *Id.* At the time of Mr. Zink's trial, his counsel's performance was consistent with existing law, and he was not required to predict whether autopsy reports would be found to be testimonial in nature and entitled to the protections of *Crawford.* Trial counsel, therefore, was not ineffective for failing to object to testimony and closing argument concerning the autopsy report.

### 7. Involuntary Self–Representation

Mr. Zink asserts that he was deprived of his right to counsel because his decision to represent himself was made involuntarily. He claims that his decision to waive counsel was forced on him and, therefore, was not voluntary due to: (1) insufficient staff in the public defender's office available to assist him; (2) his mental illness; and (3) the trial court's failure to advise him that he could not approach witnesses and he would have to wear a leg brace under his pants prior to him making the decision to waive counsel.

A post-conviction motion cannot be used as a substitute for a direct or second appeal. *See Tisius,* 183 S.W.3d at 212. This Court previously heard Mr. Zink's direct appeal in which he alleged that his waiver of the right to counsel was not given voluntarily, knowingly and intelligently. *Zink,* 181 S.W.3d at 70. In that appeal, this Court held that Mr. Zink was competent to waive counsel and that this "waiver was given voluntarily, knowingly and intelligently." *Id.* at 70. This Court found that:

> The transcript of the hearing on [Mr. Zink's] motion [to proceed without counsel] and the legal file both confirm that [Mr. Zink] was fully informed of the charges; the potential penalties he faced if convicted, including confinement or death; his rights to appointed counsel and to a trial by jury; the perils of self-representation; and all potential consequences associated with the waiver of counsel.

*Id.* at 70. This Court also noted that the trial court told Mr. Zink that he could change his mind at any time during the trial by simply notifying the court, but that Mr. Zink never did so. *Id.* at 70–71.

While Mr. Zink now raises different factual bases for his claim, the underlying claim is the same. This Court will not review the same underlying claim for a second time. A movant cannot use a Rule 29.15 motion to raise claims that could have been, but were not, raised on direct appeal except in rare and exceptional circumstance. *Schneider v. State,* 787 S.W.2d 718, 721 (Mo. banc 1990). By adding additional factors that he claims forced him to waive his right to counsel so that his waiver was involuntary, Mr. Zink is attempting to raise claims that could have been and should have been raised on appeal. There are no rare or exceptional circumstances to permit him to do so. "Furthermore, even if the issue of waiver of counsel were held to be cognizable in this post-conviction proceeding, the record amply refutes [Mr. Zink's] contention that he did not knowingly and intelligently waive his constitutional right to counsel." [12] *Henderson v. State,* 786 S.W.2d 194, 197 (Mo.App.1990). And, because this Court has found Mr. Zink competent, there can be no prejudice due to counsel's failure to challenge Mr. Zink's competency to waive counsel.

The only claim that could arguably be cognizable is Mr. Zink's assertion that his counsel was ineffective in failing to advise him prior to his waiver of counsel that the trial court could require him to be shackled and not permit him to approach witnesses if he waived of counsel. The claim is without merit, however, because Mr. Zink suffered no prejudice. Mr. Zink was aware throughout the trial, including after he was informed that he was required to wear a leg brace and that he could not approach witnesses, that he could change his mind and be represented by the public defenders. Despite being told by the trial court that he could withdraw his waiver, he chose to continue to represent himself.

## 8. Signing of the Attorney General's Proposed Findings

Mr. Zink alleges that the motion court erred by signing the findings of fact and conclusions of law prepared by the attorney general's office. He contends that

---

**12.** The evidence shows that Mr. Zink did not choose to represent himself because of inattention due to the understaffing and overwork of the public defender's office but rather because he disagreed with counsel's failure to use a lengthy list of questions that Mr. Zink prepared for his examination during a suppression hearing and disagreed over defense strategy.

because the motion court found individuals to be credible on certain matters and the same individuals to be incredible on other matters, the Rule 29.15 hearing and conclusions were a meaningless formality.

■■■■■ "As the trier of fact, the trial court determines the credibility of witnesses and is free to believe or disbelieve all or part of the witnesses' testimony." *Blue Ridge Bank and Trust Co. v. Hart,* 152 S.W.3d 420, 426 (Mo.App.2005). Simply because the motion court found individuals to be credible on certain issues and not credible on others does not indicate any error by the motion court. While "[t]rial judges are well advised to approach a party's proposed order with the sharp eye of a skeptic and the sharp pencil of an editor," *Massman Const. Co. v. Missouri Highway & Transp. Com'n,* 914 S.W.2d 801, 804 (Mo. banc 1996), "[a]s long as the court thoughtfully and carefully considers the parties' proposed findings and agrees with the content, there is no constitutional problem with the court adopting in whole or in part the findings of fact and conclusions of law drafted by one of the parties." *State v. White,* 873 S.W.2d 590, 600 (Mo. banc 1994) (overruled in part on other grounds).

Here, there is no indication that the court did not consider thoughtfully and carefully the parties' proposed findings. Furthermore, the record supports these findings. As such, there is no evidence of any constitutional problems.

### 9. Penalty Phase Instructions

Mr. Zink alleges that appellate counsel erred in failing to argue that the penalty phase instructions violated his constitutional rights, as articulated in *Ring v. Arizona,* 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002), and *Apprendi v. New Jersey,* 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000). To be entitled to relief, Mr.

Zink must demonstrate that competent and effective appellate counsel would have raised the error and that there is a reasonable probability the appeal's outcome would have been different. *Williams,* 168 S.W.3d at 444.

To determine whether an individual is eligible for the death penalty, there are four steps under section 565.030.4. Mr. Zink asserts that steps two and three of the penalty instructions violate his constitutional rights. The penalty phase instructions for step two, section 565.030.4(2), required the jury to find whether there were facts or circumstances in aggravation of punishment that warranted imposition of the death penalty. The penalty phase instructions for step three, section 565.030.4(3), required the jury to determine whether there were facts or circumstances in mitigation of punishment that were sufficient to outweigh the facts or circumstances in aggravation. The court did not require the jury to find either of these steps beyond a reasonable doubt. Mr. Zink asserts that appellate counsel's failure to raise the instructions pertaining to these two steps as a violation of his constitutional rights, as articulated by the United States Supreme Court in *Apprendi* and *Ring,* constituted ineffective assistance of counsel. *Apprendi* holds that, "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." *Apprendi,* 530 U.S. at 490, 120 S.Ct. 2348. *Ring* applied *Apprendi,* emphasizing that "[i]f a State makes an increase in a defendant's authorized punishment contingent on the finding of a fact, that fact—no matter how the State labels it—must be found by a jury beyond a reasonable doubt." *Ring,* 536 U.S. at 584, 122 S.Ct. 2428.

Step two requires the jury to find whether the aggravation evidence warrants death and step three directs the jury to determine whether the evidence in mitigation outweighed aggravation. Neither of those obligations requires a finding of a fact that may increase Mr. Zink's penalty. Instead, the jury is weighing evidence and all information before them. Only findings of fact that increase the penalty for a crime beyond the prescribed statutory maximum are required to be found by a jury beyond a reasonable doubt. This Court previously has recognized this distinction and held that steps two and three do not need to be found by a jury beyond a reasonable doubt. *See State v. Glass,* 136 S.W.3d 496, 520–21 (Mo. banc 2004); *State v. Gill,* 167 S.W.3d 184, 193 (Mo. banc 2005). Mr. Zink fails to demonstrate how the failure of appellate counsel to raise a meritless claim would have resulted in a different appellate outcome. *See Nicklasson,* 105 S.W.3d at 487.

### 10. Constitutional Validity of Lethal Injection

 Mr. Zink asserts the motion court erred in denying discovery and a hearing on his claim that Missouri's method of lethal constitutes cruel and unusual punishment. When a condemned person has not yet exhausted his appeals, it is premature to consider a claim involving the method of execution, as "it is unknown what method, if any, of lethal injection may be utilized by the State of Missouri at such future time, if any, as [Mr. Zink's] right to seek relief in state and federal courts is concluded and his execution date and method are set." *Worthington,* 166 S.W.3d at 583 n. 3. As such, Mr. Zink's claim challenging the constitutional validity of the method of execution is not yet ripe, and the motion court did not err in denying discovery and a hearing on an unripe claim.

## IV. Conclusion

For the foregoing reasons, this Court finds that the motion court did not clearly err in overruling Mr. Zink's motion for post-conviction relief. The judgment of the motion court, therefore, is affirmed.

STITH, C.J., PRICE, TEITELMAN, RUSSELL and WOLFF, JJ., concur.

FISCHER, J., not participating.